UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY KENNEY,<br>     Plaintiff<br><br>V.<br><br>INTEGRATED DISABILITY RESOURCES,<br>INC. and JOHN HANCOCK LIFE<br>INSURANCE COMPANY,<br>     Defendants | CIVIL ACTION NO. 04CV11318RCL |

## JOHN HANCOCK LIFE INSURANCE COMPANY'S STATEMENT OF MATERIAL FACTS

1.    Mary Kenny was born on 3/20/59. (00116)[1]. She studied programming courses in college and holds an associate degree in business administration. (00141).

2.    From December 1981 to March 1991, Ms. Kenny worked as a system analyst/programmer. The last eight of those ten years Ms. Kenny worked for John Hancock. (00141).

3.    On 3/15/91, at the age of 32, Ms. Kenny stopped working and claimed to be totally disabled due to chronic fatigue ("CFS") and immune dysfunction syndrome. (00116).

4.    On 10/15/91, Ms. Kenny filed a claim for total disability benefits under the plan John Hancock had established pursuant to the terms of ERISA ("the Plan"), which was funded by Group Policy No. 1-GCC. (00116-118).

---

[1]    Numbers in parenthetical correspond to the Administrative Record which is submitted with this motion.

{H:\PA\Lit\19194\00002\A0768264.DOC}

5. The Plan provides:

>3.1 The Company [John Hancock] shall be the named fiduciary and the administrator of the Plan for purposes of the Employee Retirement Income Security Act of 1974 (ERISA) and shall have the authority to control and manage the operation and administration of the Plan. The Company shall have the power to adopt such rules and regulations as it may deem necessary or appropriate for the efficient operation and administration of the Plan. … The Company shall interpret the Plan and determine all questions arising under it. Any such determination by the Company shall be binding on all persons affected thereby. (00043).

6. Under the terms of the Plan, "Totally disabled" means:

>(1) In order to determine when you start a continuous period of total disability, and for the first 36 months … of such period, only such incapacity, as determined by the Company, and which is due to a physical or mental impairment which keeps you from doing all the essential duties of your occupation; and
>
>(2) after the first 36 months … period and for the rest of such continuous period of total disability, such incapacity which is due to a physical or mental impairment, which keeps you from doing the essential duties of any occupation or employment for which you are qualified by education, training or experience. (00004)

7. The Plan provides:

>LIMITATIONS AND EXCLUSIONS
>You may not receive LTD Benefits:
>   …
>(g) for any physical or mental condition which cannot be verified by the use of clinical and laboratory diagnostic techniques… (00041).

8. John Hancock began paying Ms. Kenny total disability benefits as of 11/6/91. (00234-235).

9. As is provided for by the terms of the Plan, John Hancock periodically examined Ms. Kenny's claim over the years beginning in 1992. (00010).

10. As part of its periodic examinations, John Hancock obtained and reviewed Ms. Kenny's medical records from her doctors and obtained Attending Physician's Statements ("APS") from her doctors.

11. Over the years from 1992 to 1998, Ms. Kenny saw a number of physicians regarding her alleged medical conditions and physical complaints. They included the following:

- 1992:

    - Dr. Janson, a holistic medicine physician of the Cambridge Center for Holistic Health. On the APS he signed, Dr. Janson noted while Ms. Kenny reported the symptoms of CFIDS, she never appeared in the office with these findings. (00294-295).

    - Dr. Stryker, an internal medicine physician of the Stoneham Medical and Diabetes Clinic, was Ms. Kenny's primary care physician ("PCP") and saw her three times in 1992. His records include that Ms. Kenny was pregnant in 1992. (00258, 260).

    - Dr. Medwar, a chiropractor, who saw Kenny for chiropractic adjustments 32 times from May to December 1992. (00359, 363, 366-372).

- 1993:

    - Dr. Stryker, the PCP, saw Ms. Kenny one time in 1993. At that visit he noted a question of CFS, a question of cervical arthritis and ordered blood work, the results of which were normal. (00250, 253).

    - Dr. Medwar, the chiropractor, who provided Ms. Kenny with 47 chiropractic adjustments over the course of the year. (00373-386).

    - Dr. Goldman, an allergist, who saw Ms. Kenny one time, in March. (00690).

    - Dr. Shah, a family practice physician, who became Ms. Kenny's PCP in 11/93. At the first visit, Dr. Shah noted that Ms. Kenny was "very knowledgeable regarding CFS" and that she "attends support groups." (00419). When Dr. Shah saw Ms. Kenny two weeks later, she noted "consider low dose anti-depressants." (00420).

- 1994:

    - Dr. Medwar for 5 chiropractic adjustments in January. (00386-388).

    - Dr. Shah for 4 office visits. (00424, 268, 480, 481).

    - Dr. Asis, a homeopathic physician of the Marino Center for Progressive Health, saw Ms. Kenny one time in 1994. (00435-436).

- ➢ Dr. Goldman, the allergist, saw Ms. Kenny two times in 1994. (00688).

- ➢ On 3/24/94, Dr. Medwar wrote a letter to John Hancock about Ms. Kenny's condition and treatment. (00350-351). In her letter, the chiropractor stated: "In my opinion, Ms. Kenny suffers from no mental impairment or nervous condition which contributes to her total disability." On 4/4/94, Dr. Shah wrote a letter to John Hancock, which contains virtually the exact same sentence. (00344).

- 1995:

    - ➢ Two visits with Dr. Goldman, the allergist. (00687-688).

    - ➢ Four visits with Dr. Shah, the PCP. (00482, 483, 536, 531).

    - ➢ On 3/31/95, Ms. Kenny's attorney at that time sent a letter to Dr. Shah offering "assistance" in answering the questions in the insurance company report and enclosing a partially completed form for Dr. Shah. (00486).

- 1996:

    - ➢ Three visits with Dr. Shah, the PCP. (00539, 542).

    - ➢ Two visits with Dr. Goldman, the allergist. (00684).

- 1997:

    - ➢ Two visits with Dr. Shah, the PCP. (00599, 600).

        - On 4/24/97, Dr. Shah noted that Ms. Kenny feels more energy and was going to the chiropractor more frequently because she was doing more activity. (00599).

        - In 5/97, Dr. Shah left Massachusetts and Ms. Kenny had to find a new PCP. (00596).

    - ➢ Ms. Kenny went to Dr. Hoffman, a family practice physician, as her new PCP. She saw Dr. Hoffman three times in 1997.

        - On 6/19/97, Kenny had her first visit to Dr. Hoffman. (00655). Dr. Hoffman's office notes reflect that Kenny was not working but does odd jobs at home. (00655).

- On 9/9/97, Dr. Hoffman saw Kenny for the third time. Her office note of that date states that she and Kenny had a "long discussion and counseling regarding [Dr. Hoffman's] feeling uncomfortable with lawyers letter and her fax to me asking me to send all my correspondence to her lawyer first for review. I feel this is playing games with Social Security and a true disability would not need this kind of behavior. … She sees my point of view but 'all other doctors have had no problem with it, can't see why I do.' … Also, I feel our therapeutic end points are different – I wish Mary to improve and eventually come off disability – she doesn't seem to have this goal – claims she can't even write a check without forgetting/losing concentration. Yet she was able to write/type a very eloquent, thoughtful fax, times 2, without problem! I pointed out to [Ms. Kenny] that I feel an uncomfortable undercurrent … She will consider looking for another physician." (00653).

  ➢ Ms. Kenny saw Dr. Hoffman's partner, Dr. Gustafson, another family practice physician, on 12/12/97. (00652). His note of that date includes:

  > Wants to [change] MDs. Would like all correspondence [with] disability services to be reviewed by her attorney – This was agreed on that the attorney would be copied on all correspondences sent – when it was sent. (00652).

  ➢ Ms. Kenny saw her chiropractor, Dr. Medwar, for adjustments 40 times in 1997. (00629, 631-634, 636-649).

  ➢ Ms. Kenny saw her allergist, Dr. Goldman, two times in 1997. (00686).

- <u>1998</u>:

  ➢ Ms. Kenny saw the family practice physician, Dr. Gustafson three times in 1998. (00650-651).

    - On 4/28/98, Dr. Gustafson's note reflects that he and Ms. Kenny discussed the possibility of using anti-depressants. The notes of that date also state that Ms. Kenny is not interested in any large degree in trying new therapies. (00651).

    - On 5/30/98, Dr. Gustafson discussed with Ms. Kenny that he was leaving Massachusetts and recommended that she follow up with Dr. Shah. (00650).

  ➢ Ms. Kenny returned to Dr. Shah on 7/17/98. (00669). Dr. Shah's diagnosis on that date was "GERD, insomnia, allergies." The note of that

> date states "Goal of 'getting better'." (00669). Ms. Kenny saw Dr. Shah three more times in 1998. (00670, 677, 678).

> ➢ Ms. Kenny saw Dr. Medwar, her chiropractor, for adjustments 30 times in 1998. (00615-628, 630).

12. On 7/7/98, Dr. Hoffman wrote a letter to John Hancock in which she stated that based upon her medical findings, it was her professional opinion that Ms. Kenny does not have a medical condition severe enough to qualify for medical disability. (00659).

13. On 7/7/98, Dr. Hoffman also completed an APS. (00660). In it Dr. Hoffman stated that Ms. Kenny "needs intensive psychotherapy, a plan to help her rehabilitate mentally and physically" and that Ms. Kenny "has some trigger points and features of CFS, but this should not totally disable her from some light occupational duties." (00660).

14. John Hancock continued to pay disability benefits to Ms. Kenny based upon other physicians' certifications that Ms. Kenny was disabled and based upon Ms. Kenny's own reports of her limitations. (Dr. Medwar, 00612; Dr. Goldman, 664; and Dr. Shah, 668). In response to the question on the APS "What objective medical evidence specifically prevents the patient's return to work now?" Dr. Goldman responded "MAINLY SUBJECTIVE." (00664). Ms. Kenny and Dr. Shah repeatedly certified that Ms. Kenny was generally confined to her home and/or bed, had decreased cognitive abilities and fatigue, and Ms. Kenny repeatedly certified that she also experienced pain and weakness. (Dr. Shah, 00668, 673, 702; Ms. Kenny, 323, 485, 540, 541, 603-606, 672, 699-701).

15. From time to time, John Hancock's reviewing physicians spoke with Ms. Kenny's doctors to clarify questions about her condition. However, on 9/13/00, and on 8/13/01, Ms. Kenny altered the authorizations that permitted communications between John Hancock's reviewing physicians and Ms. Kenny's physicians and granted permission for John Hancock to

communicate with her treating physicians "in writing only." (00676, 00719). John Hancock requested an unaltered authorization from Ms. Kenny. (00720). Ms. Kenny never provided one.

16.     As part of its routine investigation of Ms. Kenney's claim, John Hancock conducted a telephone interview with her on 7/25/01. (00706-711). Ms. Kenny reported that she was nursing her three month old son; she was exhausted from the baby; she only drives about five minutes; and she has help all around her. (00707-708). When asked if she was ready to return to work, Ms. Kenny stated "No – she thought about it and hopes to do that someday but couldn't do any of that now. She would need total reconditioning of muscles as her physical condition would not sustain [return to work]. She plans to discuss a therapy program with her dr re conditioning of muscles." (00709).

17.     On 8/8/01, John Hancock sent a second letter to Ms. Kenny requesting updated information about her condition. (00172).

18.     On 8/9/01, John Hancock received another APS from Ms. Kenny's physician, Dr. Shah. (00713-715). Dr. Shah certified that Ms. Kenny has <u>no</u> sustained tolerance to walking; that the maximum number of pounds Ms. Kenny can lift/carry is 10 for 0 to 2.5 hours per day; and that Ms. Kenny can <u>never</u> lift/carry more than 10 pounds. (00713). Dr. Shah also certified that the highest level of mental alertness Ms. Kenny is able to meet is "Low" and that she "cannot function on any regular basis." (00715).

19.     John Hancock conducted surveillance of Ms. Kenny for the first time on 9/4 and 9/5/01. (00722-734, **video**).[2] On both days, Ms. Kenny was far more active than she or her physicians had reported to John Hancock.

---

[2]     The video surveillance of Ms. Kenny is provided as part of the Administrative Record.

20.    On 9/4/01, beginning at approximately 10:30 a.m., Ms. Kenny was seen doing all of the following without any breaks and without any apparent difficulties:

- Ms. Kenny left her house and walked down the stairs to her car while carrying her baby in a baby car seat. (00726). She then drove her car for seven minutes and turned around several times talking to her baby in the back seat. (00727). Ms. Kenny then parked her car in the Osco Drug parking lot, and without any apparent difficulty, retrieved a file of papers from her front seat and her pocket book, exited the car, walked a short distance to get a cart, pushed the cart along side the car, lifted her baby in the car seat out of the car, up to her shoulder level and onto the cart. During this time, Ms. Kenny bent over, reached and turned her body several times. Her movements were fluid and unrestricted. Ms. Kenny then pushed the cart across the parking lot, walking at an average pace in a fluid manner, turning her head, looking around the parking lot and then running her fingers through her hair before she walked into the drug store. (00727, **video**). While inside the drug store, Ms. Kenny photocopied documents and used a machine. (00727).

- Ten minutes later, Ms. Kenny left the drug store and went into the Food Master located next door. She was in the grocery store for thirty two minutes. (00727). She then came out and while smiling, she pushed the grocery cart across the parking lot, walked backwards and forwards, pushing and pulling the cart to maneuver around other cars in the parking lot, and stopped and spoke with a person in the parking lot using her hands and smiling as she spoke. Ms. Kenny put her folder of papers and grocery bag easily into the car. She then lifted her baby in the car seat off the grocery cart and bent over and into the car to put him in. She then briskly walked to her side of the car, got into the car in a fluid manner, and drove away. (00727, **video**).

- Ms. Kenny then drove six minutes from the grocery store to her chiropractor's office. Once there, she got herself and her baby in the car seat out of her car. She then bent over and lifted the car seat off of the ground. She then carried her baby in the car seat and her purse, walked up the stairs of the chiropractor's office and went into the building. Her movements appeared fluid and unrestricted. (00727, **video**). After 17 minutes, Ms. Kenny left the chiropractor's office, walking down the stairs with ease while carrying her baby in the car seat and her purse to her car. She put the car seat on the ground, opened the car and then bent over, lifted the car seat, bent over, leaned into the backseat and put it into the car. She then easily turned her head several times looking around as she walked around the car, got into her seat and drove away. (00728, **video**).

- On her way home, Ms. Kenny stopped and mailed some letters in a post box. When she arrived back home, she carried her baby up the stairs and entered her house. (00728).

21.  The following morning, 9/5/01, Ms. Kenny was out and active again. Again, she exhibited no difficulties engaging in the following activities:

- Ms. Kenny left her house just before 10 a.m. with a man and her baby and walked up the street at a consistent pace while conversing with the man while he pushed the baby in a stroller. For the next 14 minutes, Ms. Kenny and the man pushing the stroller walked along streets and through a park in the vicinity of Ms. Kenny's home. They talked as they walked together at a consistent pace. Ms. Kenny then returned to her home and carried her baby up the stairs of her house and inside. (00730, **video**).

- 18 minutes later, Ms. Kenny again left her house, carrying her baby down the stairs from the house and walked to her car. (00731). She drove 10 minutes to Shaw's Supermarket. When she arrived at the grocery store, she got a shopping cart, lifted her baby in the car seat out of the car and placed the car seat holding the baby onto the grocery cart. She then pushed the grocery cart across the parking lot and into the grocery store. After 20 minutes in the grocery store, Ms. Kenny left and returned to her car where she placed several items, including a gallon of water, into the trunk. She then lifted her baby in the car seat out of the cart and put him into the car. In doing so, Ms. Kenny lifted, bent, and leaned her body into the car. She then pushed the empty cart across the parking lot, returned to her car and drove home. (00731, **video**).

- In the early afternoon, two women and a young girl went to visit with Ms. Kenny at her home. (00732).

22.  John Hancock conducted additional surveillance of Ms. Kenny on 9/13, 9/14 and 9/15/01. (00738-746, **video**). Again, Ms. Kenny was more active than she or her physicians had reported to John Hancock.

23.  On 9/13/01, Ms. Kenny was active during the morning and afternoon hours:

- Ms. Kenny was first observed outside her home at 10:15 a.m. (00740). She was walking with a man who was pushing a baby carriage. At 10:20 a.m. the man left Ms. Kenny's house in a car. (00740).

- Ms. Kenny was next observed at 3:45 p.m. as she backed her car out of her driveway and drove 12 minutes to a veterinary hospital. Ms. Kenny then exited her car, carrying her pocketbook over her shoulder, and entered the veterinary hospital. When Ms. Kenny left the veterinary hospital, she walked briskly back to her car, carrying her pocketbook over her shoulder. (00741, **video**). After maneuvering her car out of a tight parking area, Ms. Kenny drove out of the veterinary hospital parking lot. After seven minutes, the investigator lost Ms. Kenny's car in rush hour traffic. (00741).

- Over an hour later, when Ms. Kenny's car was still not back at her home, the investigator terminated surveillance for the day. (00741-742).

24. The following day, 9/14/01, Ms. Kenny was seen in the afternoon when she put her son in a carriage at the foot of the rear steps to her home and began pushing the carriage as she embarked on a walk. She was wearing running sneakers, leggings and a jacket. For the next twenty minutes, Ms. Kenny walked and pushed the stroller on flat ground and up and down inclined sidewalks. As she walked, Ms. Kenny waved to people, smiled and momentarily chatted with a passerby. She then returned to her home, climbed the stairs, got the mail, went back down the stairs. Then, pushing the stroller with one hand and carrying a package in the other hand, Ms. Kenny continued walking. She then went back up the stairs and entered her house while carrying her son in her arms. Throughout this time, Ms. Kenny walked at a consistent and unhampered pace with no apparent difficulties whatsoever. (00743, **video**).

25. The next day, 9/15/01, over the course of more than an hour in the mid-morning, Ms. Kenny was seen doing the following:

- She left her home carrying her baby in his car seat down the rear stairs of her house without any apparent difficulty. She put him and his car seat together into the car and drove away. (00744, **video**). The investigator lost sight of Ms. Kenny's car after approximately 10 minutes of driving. (00744). Almost an hour later, Ms. Kenny returned home, parked and exited her car. She had her pocketbook over her shoulder as she reached into the trunk of her car and retrieved two full plastic grocery bags. She transferred the bags from one hand to the other, closed the trunk and, walked carrying the two bags in one hand up the stairs and into her home. Her movements were fluid and unrestricted. (00745, **video**);

- Ms. Kenny then left her home, went back down the stairs and with a spring in her step walked to her car. With both hands she got her son's car seat out of the car and carried the car seat, with her son in it, and her pocketbook over her shoulder. She held the car seat in one hand for a few moments, and then walked, carrying the car seat in both hands, and went up the stairs and into the house. (00745, **video**).

26. On 2/11/02, seeking a further medical evaluation in light of the inconsistency between Ms. Kenny's reported subjective symptoms and APSs, and her surveillance activities, John Hancock requested that Merlyne Higa, R.N. review the updated medical information and provide her evaluation.

27. On her APS of 11/15/02, Dr. Shah again certified that Ms. Kenny has <u>no</u> sustained tolerance to walking, can <u>never</u> carry more than 10 pounds, cannot push or pull with either or both hands and cannot function on any regular basis. (00832-834).

28. On a questionnaire completed by Ms. Kenny on 11/17/02 for John Hancock, she stated that she walks "when able, short distances for just a few minutes at a time between rests" and that she drives less than 10 miles when able. (00837).

29. On 11/25/02, Ms. Kenny sent an in depth letter to John Hancock citing to and interpreting Plan documents regarding a potential offset to her benefits. (00841-848). She sent a copy of the provision in the insurance policy that she interpreted, explained her interpretation and requested that she be informed of a decision quickly so that she can appeal if it is not in her favor. (00841-848).

30. On 1/10/03, the nurse reviewer, Merlyne Higa, R.N., documented her review of the history of Ms. Kenny's condition. (00851). Nurse Higa's assessment was that Ms. Kenny's CFS was well established and documented during its initial onset 11 years earlier but that it was difficult to determine Ms. Kenny's present disease status and functionality. (00851). Nurse Higa recommended surveillance and that a Dr. Yarosh review the file and speak with Ms. Kenny's treating physicians on a peer to peer level to better understand her condition. (00851).

31. In light of the authorizations Ms. Kenny had altered prohibiting anyone from speaking with her physicians (00676, 00719), and the recommendations by Nurse Higa that after his review Dr. Yarosh speak with Ms. Kenny's physicians, John Hancock spoke with Ms. Kenny on 1/13/03, to get her permission for the two doctors to speak. (00853). Ms. Kenny refused to allow Dr. Yarosh to speak with her treating physicians, stating it was her lawyer's advice to her. (00853). Ms. Kenny also refused the offer to speak with a supervisor to confirm that the goal of the anticipated conversation between Dr. Yarosh and her treating physicians was to get clarification of Ms. Kenny's medical condition. (00853).

32. Unable to speak with Ms. Kenny's physicians, Dr. Yarosh, a Diplomate of both the American Board of Psychiatry and Neurology and the American Board of Internal Medicine, was left with a review of Ms. Kenny's file. He provided his opinions in his letter of 2/4/03. (00902-909).

33. In his letter, Dr. Yarosh noted the following:

- many of Ms. Kenny's physicians were homeopathic or holistic physicians;
- the majority of documentation in the file fails to reveal an ongoing active rheumatologic problem or infectious problem;
- there is no objectively quantifiable medical condition in the records which would render Ms. Kenny as impaired as she has alleged;
- there are numerous subjective complaints and a lack of objective findings to substantiate those complaints;
- the medical records indicate that Ms. Kenny is not motivated to return to work;
- the surveillance video clearly shows Ms. Kenny engaging in activities which she has stated are very difficult for her to complete;
- the medical records do not demonstrate sufficient objective data to justify the level of impairment claimed in the Attending Physician Statements;
- Ms. Kenny's impairment has been based on subjective findings;

- many of the physicians have taken Ms. Kenny's subjective findings at face value as opposed to more critically examining personality factors or psychological processes, which may accompany the presentation of somatic symptoms; and

- given that disability decisions need to be made based upon objective evidence, Dr. Yarosh did not find any objective evidence to indicate why Ms. Kenny cannot perform the duties of her occupation.  (00908-909).

34. On 2/5/03, the Senior Clinical Care Manager, Dennis O'Brien, RN, BSN, LNC, reviewed Dr. Yarosh's and Nurse Higa's reports and determined that the information did not indicate that functional limitations from a physical perspective impaired Ms. Kenny from being able to return to work at a sedentary level.  (00911).

35. On 2/11/03, when she saw Dr. Shah, Ms. Kenny reported that she felt like "crap," like she had a hangover in the morning even though she did not drink.  She also reported that she often gets increased tiredness in the winter and that she feels "so weak," more so if she eats grains, especially corn.  She reported that she was reading a new book on insulin resistance.  She complained of food cravings, especially for sweets.  She questioned her insulin resistance, attention deficit disorder ("ADD"), and amino acid deficiency.  Dr. Shaw discussed these issues with her and his plan was for no changes and to follow up with her "prn," meaning as needed.  (01031-1032).

36. Additional surveillance of Ms. Kenny was conducted on 2/14, 2/19 and 2/21/03.  (00924-937, **video**).  Again, Ms. Kenny's activity level was far greater than she or her physicians had reported to John Hancock.

37. On 2/14/03, over the course of more than 3 1/2 hours beginning at 10:30 a.m., Ms. Kenny was seen doing all of the following:

- Ms. Kenny left her house, went down the stairs, and with no apparent difficulties bent over into the front seat of her car for several moments, started her car in the driveway and walked back to and up the stairs and into the house.  Seventeen minutes later, Ms. Kenny left her house, and went down the stairs to her car while carrying several items in her arm.  She bent over and loaded them into the front

      seat of the car. She then returned to the house and left carrying her son, now two years old, bundled in a winter coat and leaned down and bent over, placing him in the back seat of the car.[3] (00929, **video**).

- For the next approximately 30 minutes, Ms. Kenny drove from her home in Andover to her chiropractor's office in Malden, Massachusetts. (00929-930, **video**). Upon her arrival, she removed her sleeping son from the back seat of the car and carried him, still sleeping, down the sidewalk and up the stairs to the chiropractor's office, with a diaper bag slung over her shoulder. (00930, **video**).

- Approximately 30 minutes later, Ms. Kenny left the chiropractor's office carrying her son, flowers and diaper bag, walked down the stairs, on the sidewalk and back to her car. She held her son, flowers and diaper bag in one arm as she searched for her keys in her jacket pocket. She then put a flower in the car, put down her bag, squatted down and then stood back up, all while holding her son in her arms. She then bent over and leaned her body into the car for several moments as she put her son in the back seat of the car. She then bent over and picked up the diaper bag, and leaned forward talking to her son as she easily got into the car and drove away. (00930, **video**).

- Ms. Kenny pulled into a Burger King restaurant where she parked her car, got out, leaned into the back seat and lifted her son out of the car, and carried him along with her bag, across the parking lot and into the Burger King. Twenty two minutes later, Ms. Kenny exited the Burger King carrying her son, walked across the parking lot bent over and into the back seat of the car and put him in, and a few moments later got herself into the car with no apparent difficulty before driving away. She then pulled into a parking spot at the Super Stop and Shop grocery store. (00930, **video**).

- Ms. Kenny got out of the car, bent over and got into the back seat of the car to get her son out, and while carrying him and her purse, she walked across the parking lot and into the grocery store. (00931, video). Fourteen minutes later, Ms. Kenny left the grocery store carrying a bag of groceries and her son to her car. (00931). Ms. Kenny then put her son in his car seat, got into the car and drove away. (00931, **video**).

- The investigator followed Ms. Kenny driving for approximately 30 minutes before losing her car. (00931). After not finding Ms. Kenny's car out or at her home over the course of the next three quarters of an hour, the investigator terminated surveillance for that day. (00931, **video**).

38.     On 2/19/03, beginning at 9:37 a.m., Ms. Kenny was see doing all of the

following:

- Ms. Kenny walked out of her house, down the stairs carrying the diaper bag to her car where she started the engine. She then returned to her house, climbed the stairs and went back inside. After a few minutes, Ms. Kenny again walked out of

---

[3]   On 6/5/03, Ms. Kenny told John Hancock that her son weighted 25 pounds. (01042).

> her house and down the stairs to her car. She was now carrying her son, who she put in the car. She then left the car and walked to the trash barrels at the curb and then back to her car. (00932, **video**).

- She then drove her car on several highways and stopped for gas.

- Ms. Kenny then got on I-93 South headed to Boston. She drove in excess of 80 miles per hour weaving in and out of traffic on wet, slick roads.

- Ms. Kenny exited I-93 South at Roosevelt Circle, reversed directions and drove on I-93 North. Upon entering I-93 North, Ms. Kenny sped up and began weaving in and out of traffic. When the investigator reached 92 miles per hour while following Ms. Kenny driving, she terminated surveillance.

- The investigator went to Ms. Kenny's home but did not find her there at 11:30 a.m. At 2:00 p.m., the investigator saw Ms. Kenny walking into her house carrying her son. (00932-933).

39. On 2/21/03, beginning at 9:17 a.m., Ms. Kenny was seen doing all of the following:

- shaking out a blanket on the breezeway stoop of her home. (00934, **video**).

- leaving her house carrying two bags to her car and leaning into the driver's side front door. (00934, **video**).

- Ms. Kenny then returned to the house and left carrying her son to the car, bent over and leaned into the back seat and put him in, and stood up, smiled, waved at the window of her house, got into her car and drove away. (00934, **video**).

- Ms. Kenny drove for eighteen minutes to a private residence and went inside. While Ms. Kenny was there, others arrived with small children and went into the same house. More than 1 1/2 hours later, Ms. Kenny left that house carrying her son, his diaper bag and a large paper bag. While holding her son and the bag, Ms. Kenny fished for her keys in her coat pocket and then bent over and leaned into the back seat to put her son in the car. (00935, **video**). Ms. Kenny then got into her car and drove eighteen minutes home.

- When she got home, Ms. Kenny got out of her car and carried a bag and her purse up the stairs, grabbed a handful of mail from the mailbox next to the door, and entered the house. (00935, **video**). Two minutes later, Ms. Kenny returned to her car and sat in it with her son in the back seat. Approximately 30 minutes later, Ms. Kenny leaned into the back of the car, got her son out of the back seat, and carried him up the stairs and into her house. (00936, **video**).

- Approximately 1 1/4 hours later, Ms. Kenny went down the stairs and to her car, leaned into the back seat and then returned to the house. Ms. Kenny then left the house, carrying her son down the stairs, bent over and into the car and put him in his seat in her car. Then she got in and drove away. (00936, **video**).

- The investigator lost sight of Ms. Kenny on the highway and next saw her when Ms. Kenny arrived back at the house almost two hours later. At that time, Ms. Kenny went into her house alone carrying the diaper bag, and then left the house and got her son from the back seat of the car and carried him to the house, up two stairs, turned and carried him back to the car and looked into the rear seat while smiling and talking to her son. While still holding her son, Ms. Kenny again opened the rear door, bent over twice, stood up and then returned to the house and walked up the stairs, all with her son in her arms. (00936, **video**).

40. On 4/2/03, Dr. Shah, Ms. Kenny's treating physician, responded to written questions from the reviewing physician, Dr. Yarosh. (00956-957). There was no new information in Dr. Shah's response. (00956-958). Instead, Dr. Shah simply reported Ms. Kenny's subjective symptoms: chronic disabling fatigue, nausea, body aches, weakness of varying severity, with unpredictable frequency and severity leading to inability to engage in any repetitive activity on a regular schedule. (00956).

41. By letter dated 6/2/03, John Hancock informed Ms. Kenny that she was no longer entitled to long-term disability benefits. (00969-970). The letter detailed the basis for the denial. John Hancock concluded that Ms. Kenny was able to return to work immediately in a full-time, sedentary or light occupation for which she is qualified by her education, training and experience, including her own occupation and that she is not disabled as required by the Plan. (00969). The letter also informed Ms. Kenny of her right to appeal. (00969-970).

42. By letter dated 11/18/03, Ms. Kenny appealed the denial of her long-term disability benefits. (00975). By letter dated 11/21/03, John Hancock acknowledged receipt of Ms. Kenny's appeal. (00984).

43. On 11/24/03, faced with the denial of her benefits, Ms. Kenny submitted additional medical records to John Hancock. (00986). They included:

- Narrative and records from Glenn Rothfeld, M.D., WholeHealth New England:
  - Dr. Rothfeld, a holistic physician, opined that Ms. Kenny meets the criteria for diagnosis for fibromyalgia. He also stated that her condition

> requires her to "remain housebound." "Before she can go back to work, Mary requires further treatment for her fibromyalgia, amino acid deficiencies and problems with nutrient absorption." (00992).

- ➢ Dr. Rothfeld's records include laboratory results , two of which state that the tests have "not been cleared or approved by the U.S. Food and Drug Administration." (00996, 1000).

- ➢ Dr. Rothfeld's recommendations were for holistic treatments including Meyers' infusions, Ultra Plus, detox powder and Magnesium & B IV drip. (01011-1014).

- Narrative from Dr. Medwar, the chiropractor:
    - ➢ Dr. Medwar's letter dated 10/8/03 contains essentially the same information that she previously provided regarding her impressions of Ms. Kenny's limitations. (00990-991).

- Physical Residual Functional Capacity Questionnaire ("RFC") and records from Dr. Shah:
    - ➢ The information Dr. Shah provided on the RFC was not different from the information she had provided prior to John Hancock's decision to stop paying Ms. Kenny's benefits. Dr. Shah again noted that:
        - Ms. Kenny can do only very limited walking – "0-3 blocks" without rest or severe pain;
        - Ms. Kenny can sit continuously at one time for a maximum of 5 minutes;
        - Ms. Kenny can stand continuously at one time for a maximum of 5 minutes; and
        - Ms. Kenny can <u>never</u> lift more than 9 pounds. (01016-1021).
    - ➢ Of the treatment records from Dr. Shah, only one was new to John Hancock and it contained no new information of significance regarding Ms. Kenny's condition, other than that her irritable bowel syndrome was "better." (01032).

- 2 pages of records from Robert Patsen, M.D.:
    - ➢ Dr. Patsen saw Ms. Kenny for the first and only time on 9/11/03. He noted that:
        - she had a 15 year history of chronic fatigue syndrome/fibromyalgia;
        - she had problems with her disability insurance and discontinued benefits;
        - she had had many tests and many doctors;
        - her chiropractic treatments help her;

{H:\PA\Lit\19194\00002\A0768264.DOC}    17

- his impression was fibromyalgia/chronic fatigue syndrome;
- his plan was to get Ms. Kenny's prior medical records and to not prescribe any medications until after she stopped breastfeeding her 2 year old son

➢ On 10/28/03, Dr. Patsen reviewed Ms. Kenny's lab results from Massachusetts General Hospital. He noted that all lab values were negative or normal. (00988-989).

44. In the 11/24/03 letter, Ms. Kenny, through her attorney, stated that she would also be submitting her chiropractor, Dr. Medwar's office notes. (00986). Ms. Kenny never did so.

45. John Hancock reviewed the additional records Ms. Kenny submitted on appeal and determined that there was not sufficient information submitted to warrant reversal of the decision. (01039-1040).

JOHN HANCOCK LIFE INSURANCE COMPANY

By its attorneys,

/s/ Elizabeth L. B. Greene
Joseph M. Hamilton, BBO #546394
Elizabeth L. B. Greene, BBO #561456
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: March 4, 2005

### CERTIFICATE OF SERVICE

I, Elizabeth L. B. Greene, hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Michael J. Kelley, Esq., 167 Milk Street, Suite 428, Boston, MA 02109.

/s/ Elizabeth L. B. Greene
Elizabeth L. B. Greene

Dated: March 4, 2005