UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY KENNEY,<br>　　　　Plaintiff<br><br>　　　　V.<br><br>INTEGRATED DISABILITY RESOURCES,<br>INC. and JOHN HANCOCK LIFE<br>INSURANCE COMPANY,<br>　　　　Defendants | CIVIL ACTION NO. 04CV11318RCL |

**MEMORANDUM IN SUPPORT OF JOHN HANCOCK LIFE INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT**

### I.　　　NATURE AND STATUS OF PROCEEDINGS

This is an action for total disability benefits under a plan governed by ERISA.  The

plaintiff, Mary Kenny, was provided disability coverage under an employee welfare benefit plan

("the Plan") that her employer John Hancock Life Insurance Company ("John Hancock")

provided to its employees.

Between 1991 and 2003, John Hancock paid Ms. Kenny total disability benefits.

Initially, she received these benefits under the Plan after a determination that she was totally

disabled from her *own* occupation.  After the first 36 months, as provided for by the Plan, Ms.

Kenny's benefits were continued after a determination that at that time she was totally disabled

from *any* occupation.  In June 2003, following an investigation that included extensive

surveillance and a thorough independent medical review, John Hancock determined that Ms.

Kenny was not entitled to further long-term disability benefits under the Plan because she was no

longer totally disabled from *any* occupation.

In November 2003, Ms. Kenny appealed the denial of her long-term disability benefits, submitted some medical records and reports in support of her appeal, and stated that additional records would be forthcoming.  Ms. Kenny never submitted the additional records.  John Hancock reviewed the records Ms. Kenny submitted in November 2003 and determined there was not sufficient evidence submitted to warrant reversal of the decision.

Having exhausted her administrative remedies, Ms. Kenny filed this action seeking a declaration that she is entitled to recover total disability benefits pursuant to the Plan.

John Hancock now moves for summary judgment on Ms. Kenny's claim for benefits under the Plan.  A review of the administrative record reveals that John Hancock's decision to deny Ms. Kenny benefits under the Plan was neither arbitrary nor capricious as a matter of law.

## II.     STATEMENT OF UNDISPUTED FACTS

John Hancock incorporates by this reference its Statement of Undisputed Facts prepared pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 and filed contemporaneously with this memorandum.

## III.     ARGUMENT

A.     John Hancock's Decision To Deny Benefits Is Reviewed Under An Arbitrary And Capricious Standard of Review.

The Court reviews ERISA claims arising under 29 U.S.C. §1132(a)(1)(B) *de novo* unless the benefits plan in question confers upon the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 583 (1st Cir. 1993)(citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  If the plan clearly gives such discretionary authority, then the administrator's decisions are subject to "a deferential 'arbitrary and capricious' standard of

judicial review." <u>Recupero v. New England Tel. & Tel. Co.</u>, 118 F.3d 820, 827 (1st Cir. 1998)(citing <u>Firestone</u>, 489 U.S. at 115).

An ERISA plan need not contain or employ certain "magic words" or a particular linguistic template in order to endow an administrator with discretionary authority. <u>Wildbur v. Arco Chemical Co.</u>, 974 F.2d 631, 637 (5th Cir. 1992)(no "magic words" required to trigger deferential standard of review); <u>Kiley v. Travelers Indemnity Co. of Rhode Island</u>, 853 F. Supp. 6, 10 (D. Mass. 1994). Instead, it need only appear on the face of the plan documents that the fiduciary has been "given the power to construe disputed or doubtful terms" or to resolve disputes over benefits eligibility. <u>Rodriguez</u>, 986 F.2d at 583; <u>see e.g.</u> <u>Chandler v. Raytheon Employees Disability Trust and Metropolitan Life Ins. Co.</u>, 53 F. Supp. 2d 84, 89 (D. Mass. 1999)(discretion where plan administrator "shall have the exclusive right, in their sole discretion, to interpret the plan and decide all matters arising thereunder … . All determinations shall be conclusive and binding on all persons unless it can be shown that the interpretation or determination was arbitrary and capricious.") <u>aff'd</u> 2000 U.S. App. LEXIS 13997 (1st Cir. 2000); <u>see also</u> <u>DiSieno v. American Home</u>, 26 F. Supp. 2d 209 (D. Mass. 1998)(discretion where plan states administrator shall "interpret the Plan … and his decision … shall be conclusive and binding …").

The Plan in this case provides that:

3.1 The Company [John Hancock] shall be the named fiduciary and the administrator of the Plan for purposes of the Employee Retirement Income Security Act of 1974 (ERISA) and shall have the authority to control and manage the operation and administration of the Plan. The Company shall have the power to adopt such rules and regulations as it may deem necessary or appropriate for the efficient operation and administration of the Plan. … The Company shall interpret the Plan and determine all questions arising under it. Any such

determination by the Company shall be binding on all persons affected thereby. (00043).[1]

As such, the Plan clearly provides John Hancock with the discretionary authority to determine benefit eligibility and the arbitrary and capricious standard of review must be applied.

Under this standard, a decision to deny benefits must be upheld if it "is reasoned and 'supported by substantial evidence in the record.'" Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 29-30 (1st Cir. 2001) quoting Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997); Matias-Correa v. Pfizer, 345 F.3d 7, 12 (1st Cir. 2003) ("touchstone is whether [administrator]'s benefits determination was reasonable").  A decision is supported by "substantial evidence" when the evidence is reasonably sufficient to support the conclusion.  Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998).

The "sufficiency of the evidence to support [the administrator's] determination [to deny coverage] 'does not disappear merely by reason of contradictory evidence.' (citations omitted)." See Brigham v. Sun Life of Canada, 317 F.3d 73, 84 (1st Cir. 2003); Leahy v. Raytheon Co., 315 F.3d 11, 19 (1st Cir. 2002) ("We have held before, and today reaffirm, that the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious."); Vlass, 244 F.3d at 30 (same); Sullivan v. Raytheon Co., 262 F.3d 41, 52 n. 8 (1st Cir. 2001) (administrator's decision not arbitrary and capricious merely because there is contradictory evidence).  It is the responsibility of the administrator to weigh conflicting evidence in the administrative record.  Vlass, 244 F.3d at 32.

As such, the issue before this Court is whether John Hancock's decision to discontinue disability benefits was reasoned and supported by substantial evidence in the record.

---

[1]     Numbers in parenthetical correspond to the Administrative Record which is submitted with this motion.

B.      John Hancock's Decision Denying Total Disability Benefits Was Not
        Arbitrary or Capricious.

To prevail on her total disability claim Ms. Kenny must demonstrate that based on the

evidence in the Administrative Record, (1) a physical or mental impairment keeps [her] from

doing the essential duties of any occupation or employment for which [she is] qualified by

education, training or experience" (00004); (2) her physical or mental condition can be "verified

by the use of clinical and laboratory diagnostic techniques" (00041); and (3) John Hancock's

decision that she was not totally disabled, as defined by the Plan, was arbitrary and capricious

(00043).  The burden of proof is upon Ms. Kenny.  See Brigham, 317 F.3d at 84-85; Terry v.

Bayer, 145 F.3d 28, 34 (1st Cir. 1998).  Ms. Kenny cannot meet this burden.

Prior to making its decision to stop paying Ms. Kenny long term disability benefits as of

June 2, 2003, the information John Hancock had before it included:  Ms. Kenny's medical

records, reports and Attending Physician Statements from numerous treating physicians from

1992 to 2003; Ms. Kenny's own reports and certifications of her limitations and disabilities; the

reports and videotape of surveillance of Ms. Kenny's activities on five dates in 2001 and on three

dates in 2003; and the eight page, single spaced, detailed report of Scott M. Yarosh, M.D., a

Diplomate of both the American Board of Psychiatry and Neurology and the American Board of

Internal Medicine, and an independent physician located in Minneapolis, MN, whom John

Hancock contacted to review Ms. Kenny's file in its entirety and provide his expert opinions.

The only rational conclusion to be reached from those materials was that as of June 2,

2003, Ms. Kenny no longer met the Plan definition of total disability.

1.      Ms. Kenny's and her doctors' reports regarding her
        functional abilities in 2001 were not accurate.

On July 25, 2001, Ms. Kenny reported to John Hancock that she was nursing her three

month old son, that she was exhausted from the baby, that she only drove about five minutes and

that she had help all around her.  (00707-708).  On August 9, 2001, Ms. Kenny's treating

physician, Dr. Shah, certified to John Hancock that Ms. Kenny has <u>no</u> sustained tolerance to

walking; that she can lift a maximum of 10 pounds for zero to 2.5 hours per day, and that she can

<u>never</u> lift more than 10 pounds.  Dr. Shah also certified that Ms. Kenny's highest level of mental

alertness was "low" and that she "cannot function on any regular basis."  (00713-715).  There is

nothing documented in Dr. Shah's treatment records of Ms. Kenny in 2001, not even subjective

complaints reported by Ms. Kenny, that provides any basis for these restrictions and limitations.

> 2.     Ms. Kenny's true functional abilities in 2001 are seen
>        through the September 2001 surveillance of her activities.

The surveillance John Hancock conducted of Ms. Kenny on two groups of consecutive

days in September 2001 (five days total), reveal that Ms. Kenny was far more active than she or

Dr. Shah reported to John Hancock.  (00722-734, 738-746, video).

On those five days in September 2001, Ms. Kenny repeatedly walked up and down the

exterior stairs to her home while carrying her three-month old son in his bucket car seat carrier,

which easily weighed more than 10 pounds.  Every day, Ms. Kenny lifted, carried and walked

with that weight, in addition to her pocketbook, without any apparent difficulty.  She also drove

her car several times on four of those five days for significantly longer than the five minute

maximum she reported being capable of doing.

On September 4, 2001, Ms. Kenny and her baby alone drove to the drug store, the

grocery store, and the chiropractor's office, all in a row.  At each stop, Ms. Kenny bent her body

as she essentially climbed in an out of the back seat of her car to get her son, who was in his

bucket car seat, in and out of the middle spot in the rear seat of her car.  She spent measurable

amounts of time at each of the three locations, including thirty-two minutes in the grocery store.

When she left the grocery store, she was smiling as she walked across the parking lot to her car,

pushing a grocery cart with her son in his bucket car seat perched on top.  She walked backwards and forwards, pushing and pulling the grocery cart.  She even stopped to chat, using her hands and smiling as she spoke.  She did not have any difficulties or restrictions of her movements.  (00726-728, video).

The next morning, Ms. Kenny was out walking with a man who was pushing her baby in a stroller.  Ms. Kenny, whose doctor certified that she had <u>no</u> sustained tolerance to walking, walked in stride with the man, along the street and through a park, for 14 minutes.  They talked as they walked at a consistent pace, and Ms. Kenny had no difficulties.  Upon returning to the house, Ms. Kenny, not the man, carried her son up the stairs and into her house.  But she did not stop there.  Less than 20 minutes later, Ms. Kenny carried her son down the steps and to her car.  She then drove 10 minutes to the grocery store, where she again lifted her son, in his bucket car seat, out of the car and onto the top of a grocery cart.  She shopped for 20 minutes, and returned to the car where she placed several items including a gallon of water, into her trunk and then lifted her son in his bucket car seat, and leaned all the way into the back seat of her car to put her son and his seat in.  She then walked the grocery cart back across the parking lot, returned to her car, and drove home.  Her day did not end there.  Despite her self-reported exhaustion, in the early afternoon Ms. Kenny received guests at her home.  (00730-732, video).

Eight days later, on September 13, 2001, John Hancock conducted additional surveillance of Ms. Kenny.  She walked with her son in the stroller in the morning.  In the afternoon she ran errands.  While doing so, Ms. Kenny walked briskly across a parking lot and drove her car significantly more than five minutes at a time on more than one occasion that day.  (00740-742, video).

On the only day of the five that Ms. Kenny was not observed driving her car, she was still active.  On September 14, 2001, Ms. Kenny carried her son down the stairs of her house to his stroller which she pushed for the next 20 minutes as she went for a walk alone with her son.  She wore running sneakers, leggings and a sporty jacket.  She walked up and down inclined sidewalks, pushing the stroller.  As she walked, she waived to people, smiled, and stopped and chatted with a passerby.  She did not appear to have any difficulties whatsoever.  She did not need anyone's assistance.  Moreover, she appeared to be a regular walker, given her apparel and waiving, smiling and chatting with the people in the neighborhood.  (00743, video).  Contrary to Dr. Shah's certification, Ms. Kenny was indeed capable of walking.

Ms. Kenny's walk did not hamper her activity level the next day.  On September 15, 2001, Ms. Kenny went out again alone with her baby.  She drove for 10 minutes before the investigator lost sight of her.  An hour later she returned home, carried two full plastic grocery bags in one hand up the stairs into her house.  She went back down the stairs and with a spring in her step, walked to her car, climbed in the back seat and got her son in his bucket car seat out of the middle spot.  She then held the bucket car seat in one hand for a few moments before walking, carrying it, and going up the stairs back into the house.  Throughout, Ms. Kenny's movements were fluid and she did not appear to have any difficulties.  (00744-745, video).

3.    Ms. Kenny's and her doctors' reports regarding her
       functional abilities in 2002 and 2003 were not accurate.

In November 2002, Dr. Shah again certified that Ms. Kenny had <u>no</u> sustained tolerance to walking, and can <u>never</u> carry more than 10 pounds.  He also certified that she cannot push or pull with either or both hands, and cannot function on any regular basis.  (00832-834).  Also in November 2002, Ms. Kenny informed John Hancock that she only walks "when able, short

distances for just a few minutes at a time between rests" and that she drives less than 10 miles when she is able to do so.  (00837).

Ms. Kenny also began to curtail John Hancock's ability to understand her then current medical condition by limiting communication with her treating physicians.  In January 2003, John Hancock spoke with Ms. Kenny to try to get her permission for a reviewing physician to speak with her treating physician.  (00853).  This was necessary because Ms. Kenny had altered the usual authorization from John Hancock and would only allow written communications with her physicians.  (00676, 719).  Ms. Kenny refused to allow verbal contact with her treating physicians.  (00853).

A month later, on February 11, 2003, Ms. Kenny went to Dr. Shah and reported that she felt weak and very tired, more so if she ate grains, especially corn.  She also reported that she was reading a new book on insulin resistance.  She complained of food cravings, especially for sweets.  She questioned her insulin resistance, attention deficit disorder, and amino acid deficiency.  (01031-1032).

> 4.    Ms. Kenny's true functional abilities in 2002 and 2003 are seen through the February 2003 surveillance of her activities.

Just three days after her visit to Dr. Shah, John Hancock conducted additional surveillance of Ms. Kenny's activities.  (00924-937, video).  On February 14, 2003, the self-reported weak and tired Ms. Kenny was out and active with her now two-year-old son (whom she still carried everywhere) [2] for more than 3 1/2 hours.  (00929-931, video).

Beginning at 10:30 a.m., Ms. Kenny made two trips down the stairs of her house, back and forth to her car.  The second time she went to the car she carried her son, bundled in a snow jacket.  She drove for 30 minutes and when she got to her destination, carried her sleeping two-

---

[2]    On 6/5/03, Ms. Kenny told John Hancock that her son weighted 25 pounds.  (01042).

year-old son and his diaper bag from the car down the sidewalk and up a flight of stairs to her

chiropractor's office.[3]  (00929-930, video).  As anyone with a small child knows, the dead

weight of a sleeping child is much heavier than when they are awake.

When Ms. Kenny came out of her chiropractor's office, she carried her son, the diaper

bag and flowers back to her car.  At her car, she held everything in one arm as she fished in her

pocket for her keys.  She bent over and lifted her son up twice , put him in his seat, and then

easily got herself into the car and drove away.  She then drove and pulled into a Burger King

parking lot.  She again retrieved her son and his diaper bag from the car and carried them into the

restaurant.  More than 20 minutes later, she left Burger King and drove to the grocery store.

Again, she got her son out of the car, shopped, and then left the grocery store carrying a bag of

groceries and her son in her arms.  Once back at her car, Ms. Kenny put the bag and her son in

and then got in and drove away.  The investigator followed her driving for 30 minutes before he

lost her.  After not finding Ms. Kenny's car at home over the next 45 minutes, the investigator

terminated surveillance for the day.  (00930-931, video).  At no time did Ms. Kenny appear to

have any difficulties or require any assistance.  Her actions and body movements appeared

normal.

On February 19, 2003, Ms. Kenny was out of the house before 10 a.m.  She again walked

up and down the stairs, carried her son, and drove in her car.  She drove on several highways.

She drove in excess of 80 miles per hour weaving in and out of traffic on wet, slick roads.  The

investigator stopped following her when his car reached the speed of 92 miles per hour while

following her.  The investigator returned to Ms. Kenny's home.  She was next seen walking into

---

[3]    There is no documentation in the Administrative Record indicating that Ms. Kenny received a chiropractic
treatment on February 14, 2003.

her house carrying her son some four hours after she had left the house that morning.  (00932-933, video).

On February 21, 2003, Ms. Kenny was out with her son beginning at approximately 9 a.m.  She again carried him up and down the stairs, to and from the car, and put him and took him out from the center seat in the back of her car at each destination.  That day, she drove 18 minutes to another home and spent 1 1/2 hours there visiting.  She then returned home with her son, and a couple of hours later, she carried him back out to the car and drove away.  The investigator lost sight of Ms. Kenny's car on the highway and next saw her when she arrived back home almost two hours later.  (00934-936, video).  At no time did Ms. Kenny appear to need assistance or have any difficulties.  Her movements were fluid.

In sum, the surveillance conducted on Ms. Kenny showed her effortlessly engaging in numerous activities that she and her treating physicians claimed she could not do.

5.     The surveillance in 2001 and 2003 establish that Ms. Kenny was capable of doing the essential duties of any occupation or employment for which she is qualified by education, training or experience.

While she claimed to be totally disabled from <u>any</u> occupation or employment for which she was qualified by education, training or experience, Ms. Kenny was fully capable of engaging in activities on a regular basis, including leaving her house in the morning hours and being active, carrying her son who weighed roughly 25 pounds, driving significant distances, at times at great speeds, lifting, carrying, pushing, and pulling.

Ms. Kenny's treating physicians gave full credence to her subjective statements to the them about her limitations.  As her treating physicians, it is not surprising that they might believe her complaints and advocate on her behalf.  However, in addition to listening to Ms. Kenny and

her treating physicians, John Hancock appropriately looked at what she did.  The surveillance video revealed that Ms. Kenny looked absolutely fine and showed no signs of being disabled.

These activities show that Ms. Kenny could have worked.  See Vlass, 244 F.3d 27 (surveillance report establishing claimant's physical capabilities and directly contradicting treating physician's opinion as to those capabilities is "most damming" piece of evidence to claimant); Garcia v. Raytheon Employees Disab. Trust and Met. Life Ins. Co., 122 F. Supp. 2d 240 (D. N.H. 2002)(decision that plaintiff is not totally disabled was supported by substantial evidence and was reasonable where one piece of evidence was private investigator's surveillance report of plaintiff's activity level); Russell, 288 F.3d at 81 (surveillance revealed "that his hunting activities, although intermittent, required a level of exertion greater than that required by his important sedentary activities.  Further, evidence of his errand running, loading and unloading baggage of various sizes, …, raised doubts of the severity of [his] disabling condition.").

The activities Ms. Kenny engaged in on the days she was under surveillance demonstrated that she was far more capable than she led her doctors and John Hancock to believe and that she was fully capable of performing a job.  Based on her activities and the hours she was out and visibly active, Ms. Kenny could work a full or part-time job.  One she is qualified for by her experience is child care.  Indeed, this is a job she has been doing as evidenced on the surveillance.  A "decision denying benefits is upheld where plaintiff is capable of working part-time."  Crossman v. Raytheon and Met. Life Ins. Co., 2004 U.S. Dist. LEXIS 26480 *3 (D. Mass. 2004) citing Doyle v. Paul Revere, 144 F.3d at 186 (stating that plaintiff is not totally disabled even where his "capacity, initially at least, may have been limited to part-time work…").

The surveillance evidence in the administrative record is damning to Ms. Kenny's claim and demonstrates that John Hancock's decision that Ms. Kenny is not totally disabled was not arbitrary or capricious.

> 6.     John Hancock did not act in an arbitrary or capricious manner in crediting the opinions of its independent record reviewing physician and not giving deference to Ms. Kenny's treating physicians' opinions.

Relying largely on Ms. Kenny's reported subjective symptoms, her primary care physician, Dr. Shah, and her chiropractor, Dr. Medwar, repeatedly certified to John Hancock that Ms. Kenny was totally disabled and was unable to function on a daily basis to any significant degree.  Faced with the discrepancy between Ms. Kenny and these reports of her limitations and the findings from the surveillance, John Hancock appropriately sought an independent medical review of Ms. Kenny's entire file.  (00851).

> a.     John Hancock was not required to simply accept Ms. Kenny's treating physicians' opinions.

Benefit plan administrators do not need to give special deference to treating physician's opinions.  Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003); Lopes v. Met. Life Ins. Co., 332 F.3d 1, 5-6 (1st Cir. 2003)(upholding plan administrator's reliance on non-examining physician's report even though treating physician stated claimant was totally disabled); Vlass, 244 F.3d at 30-32 (finding termination of benefits reasonable notwithstanding conflicting evidence provided by treating physicians, reviewing physicians and vocational assessor); Ivy v. Raytheon Employees Disability Trust, 307 F. Supp 2d 301, 307 (D. Mass. 2004)(upholding plan administrator's denial on basis of reports of reviewing physicians despite contrary opinions of treating physicians and therapists).

While "[p]lan administrators … may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician, ...we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker, 538 U.S. at 834.

>    b.    Dr. Yarosh is highly qualified and unbiased and his opinions are well reasoned and supported by the evidence in the administrative record.

John Hancock went outside the company and had Ms. Kenny's file reviewed by Scott Yarosh, M.D.  Dr. Yarosh is a Diplomate of the American Board of Psychiatry and Neurology and of the American Board of Internal Medicine.

John Hancock wanted Ms. Kenny's input in this process.  However, because Ms. Kenny had altered the authorizations which would have allowed for Dr. Yarosh to speak with her treating physicians, and because she refused to allow anything but written communications, Dr. Yarosh was left with a review of Ms. Kenny's file and no treating physician to speak with about Ms. Kenny's condition.  (00676, 719, 853).

Dr. Yarosh reviewed the file and sent a letter to Dr. Shah.  (00956-957).  In addition, in his letter dated February 4, 2003, Dr. Yarosh provided his analysis and opinions of Ms. Kenny's file.  (00902-909).  It is clear from the eight page, single spaced letter Dr. Yarosh wrote, that he carefully reviewed Ms. Kenny's entire file.  In his letter, he detailed the findings and opinions of Ms. Kenny's treating physicians, and then rendered his opinions.

Dr. Yarosh stated that:

- many of Ms. Kenny's physicians were homeopathic or holistic physicians;

- the majority of documentation in the file fails to reveal an ongoing active rheumatologic problem or infectious problem;

- there is no objectively quantifiable medical condition in the records which would render Ms. Kenny as impaired as she has alleged;

- there are numerous subjective complaints and a lack of objective findings to substantiate those complaints;

- the medical records indicate that Ms. Kenny is not motivated to return to work;

- the surveillance video clearly shows Ms. Kenny engaging in activities which she has stated are very difficult for her to complete;

- the medical records do not demonstrate sufficient objective data to justify the level of impairment claimed in the Attending Physician Statements;

- Ms. Kenny's impairment has been based on subjective findings;

- many of the physicians have taken Ms. Kenny's subjective findings at face value as opposed to more critically examining personality factors or psychological processes, which may accompany the presentation of somatic symptoms; and

- given that disability decisions need to be made based upon objective evidence, Dr. Yarosh did not find any objective evidence to indicate why Ms. Kenny cannot perform the duties of her occupation.

Following its receipt of Dr. Yarosh's letter, John Hancock determined that the information did not indicate that Ms. Kenny had functional limitations from a physical perspective that impaired her from being able to return to work at a sedentary level.  (00911).  However, John Hancock did not terminate Ms. Kenny's benefits at that time.

Instead, John Hancock ordered additional surveillance of Ms. Kenny's activities.  The surveillance in February 2003, was even more damning that the surveillance from September 2001.  (00924-937, video).  Thereafter, on April 2, 2003, Dr. Shah, Ms. Kenny's treating physician, responded to Dr. Yarosh's written questions.  However, Dr. Shah did not provide any new information.  He simply reported Ms. Kenny's subjective symptoms again, and concluded that she was unable to engage in any repetitive activity on a regular schedule.  (00956-957).

       c.     John Hancock's reliance on Dr. Yarosh's report was reasonable and appropriate.

The Administrative Record is replete with evidence that contradicts Drs. Shah and Medwar's opinions, both of which are largely based on Ms. Kenny's subjective reports.  In these circumstances, John Hancock need not provide special weight to Drs. Shah and Medwar's opinions.  Dr. Yarosh provided a detailed analysis and opinions about Ms. Kenny's condition and lack of limitations.  His report reflects his careful review of the records.

That Dr. Yarosh "did not physically examine [Ms. Kenny] does not decrease that credibility of his medical opinion…[A] non-examining physician's review of claimant's file [is] reliable medical evidence" in support of a decision to terminate benefits.  <u>Gannon v. Met. Life Ins. Co.</u>, 360 F.3d 211, 214 (1st Cir. 2004) citing <u>Matias</u>, 345 F.3d at 9-10, 12; <u>Lopes</u>, 332 F.3d at 3; <u>Leahy</u>, 315 F.3d at 19.  In <u>Matias</u>, the Court upheld an insurer's decision to terminate benefits where the only medical evidence in support of the decision was an independent medical consultant's review of the claimant's file which included evidence that Matias was in need of medical treatment, that she was capable of sedentary work and that she showed signs of symptom exaggeration.  345 F.3d at 12.  In contrast with her treating physicians' opinions, the independent medical expert concluded that Matias could work for limited periods of time, with rest.  <u>Id</u>.  The Court held that the denial was not arbitrary and capricious.  <u>Id</u>.

John Hancock appropriately relied on Dr. Yarosh's opinion.  <u>Brigham</u>, 183 F. Supp. 2d at 437, aff'd 317 F.3d 73 (1st Cir. 2003); <u>Chandler</u>, 53 F. Supp. 2d at 91; <u>Doyle</u>, 144 F.3d at 184.  The mere fact that John Hancock reached a decision contrary to the opinion of some of Ms. Kenny's treating physicians, when John Hancock based its decision on substantial evidence in the record, including the report of a qualified outside medical reviewer, Dr. Yarosh, does not

warrant finding that the denial was arbitrary and capricious.  See Brigham, 183 F. Supp. 2d 427,

437 (D. Mass. 2002); Matias, 345 F.3d at 12.

> 7.    That John Hancock did not act in an arbitrary and
> capricious manner in finding Ms. Kenny not totally
> disabled is further supported by Ms. Kenny's treating
> physicians who reported that she was not totally disabled
> and questioned the veracity of her complaints and claims of
> physical limitations.

Over the years since the inception of Ms. Kenny's claim, there have been indicators that

perhaps she was not as disabled as she claimed to be.  In 2001, things began to come to a head,

culminating with John Hancock's decision to discontinue her benefits in June 2003.  However,

the following comments and notations by Ms. Kenny's own treating physicians in 1992 and 1997

lend further credence to John Hancock's decision in 2003.

In 1992, the holistic medicine physician, Dr. Janson, noted on an APS that Ms. Kenny

has reported the symptoms of CFIDS, but has never appeared in the office with these findings.

(00294-295).

In July 1997, Dr. Hoffman, a family practice physician who was then Ms. Kenny's

primary care physician, wrote to John Hancock that based upon her medical findings, it was her

professional opinion that Ms. Kenny did not have a medical condition severe enough to qualify

for medical disability.  (00659).  On that same date, Dr. Hoffman completed an APS.  In it she

noted that Ms. Kenny "needs intensive psychotherapy, a plan to help her rehabilitate mentally

and physically" and that Ms. Kenny "has some trigger points and features of CFS, but this should

not totally disable her from some light occupational duties."  (00660).

In September 1997, Dr. Hoffman, noted in her record of Ms. Kenny's third visit to her that she and Ms. Kenny had a:

> long discussion and counseling regarding [Dr. Hoffman's] feeling uncomfortable with lawyers letter and her fax to me asking me to send all my correspondence to her lawyer first for review. I feel this is playing games with Social Security and a true disability would not need this kind of behavior. … She sees my point of view but 'all other doctors have had no problem with it, can't see why I do.' … Also, I feel our therapeutic end points are different – I wish Mary to improve and eventually come off disability – she doesn't seem to have this goal – claims she can't even write a check without forgetting/losing concentration. Yet she was able to write/type a very eloquent, thoughtful fax, times 2, without problem! I pointed out to [Ms. Kenny] that I feel an uncomfortable undercurrent … She will consider looking for another physician. (00653).

Thereafter, in December 1997, Ms. Kenny saw Dr. Hoffman's partner, Dr. Gustafson, another family practice physician. His note of that date includes:

> Wants to [change] MDs. Would like all correspondence [with] disability services to be reviewed by her attorney – This was agreed on that the attorney would be copied on all correspondences sent – when it was sent. (00652).

While John Hancock paid long term disability benefits to Ms. Kenny from 1991 to 2003, medical records such as these raised significant questions that were conclusively answered by the surveillance conducted in 2001 and 2003, and by Dr. Yarosh's independent review and report. John Hancock did not jump to discontinue Ms. Kenny's benefits at the first sign of doubt. Rather it thoroughly investigated her claim and rendered a decision in 2003 that was not arbitrary or capricious.

> 8.    That John Hancock did not act in an arbitrary and capricious manner in finding Ms. Kenny not totally disabled is further supported by Ms. Kenny's own actions with regard to her claim for benefits.

In September 2000 and in August 2001, Ms. Kenny altered the authorizations that enabled John Hancock's reviewing physicians to talk with Ms. Kenny's treating physicians about her medical condition. (00676, 719). Suddenly, eight years into receiving benefits, Ms. Kenny,

with the advice of her lawyer, decided it was not a good idea to have these two types of physicians talk to each other about her medical condition. She granted permission for written communication only. (00853). This is particularly interesting since she required of her treating physicians that they run all correspondence about her to John Hancock by her lawyer before they send it out. As Dr. Hoffman questioned in 1997, if Ms. Kenny had a true disability, why would this be necessary? (00653, 652).

In addition, although Dr. Shah certified that Ms. Kenny's highest mental functioning was "low," in November 2002, Ms. Kenny sent an in depth letter to John Hancock citing to and interpreting plan documents regarding an offset to her benefits. She sent a copy of the provision in her policy that she interpreted, explained her interpretation and requested that she be informed of a decision quickly so that she could appeal if it was not in her favor. (00841-848). To write such a letter required Ms. Kenny to read and understand the Policy, and then cogently put her thoughts together on paper, gather the supporting documentation and mail it to John Hancock. This is hardly the work of someone with "low" mental functioning.

## IV.    CONCLUSION

For the reasons stated above, the Court should grant John Hancock's motion for summary

judgment on Ms. Kenny's ERISA claim and enter final judgment in John Hancock's favor.

JOHN HANCOCK LIFE INSURANCE
COMPANY

By its attorneys,


/s/ Elizabeth L. B. Greene
Joseph M. Hamilton, BBO #546394
Elizabeth L. B. Greene, BBO #561456
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone  (508) 791-8500
Fax:    (508) 791-8502


Dated: March 4, 2005


## CERTIFICATE OF SERVICE

I, Elizabeth L. B. Greene, hereby certify that I have this day served a copy of the
foregoing document, by mailing a copy, first class mail, postage prepaid, to Michael J. Kelley,
Esq., 167 Milk Street, Suite 428, Boston, MA 02109.


/s/ Elizabeth L. B. Greene
Elizabeth L. B. Greene


Dated: March 4, 2005