UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY KENNEY,<br>    Plaintiff<br><br>V.<br><br>INTEGRATED DISABILITY RESOURCES,<br>INC. and JOHN HANCOCK LIFE<br>INSURANCE COMPANY,<br>    Defendants | CIVIL ACTION NO. 04CV11318RCL |

## JOHN HANCOCK LIFE INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT

John Hancock Life Insurance Company ("John Hancock") opposes Ms. Kenny's motion for judgment on the grounds that:

1. Where, as here, the plan contains the requisite language to confer discretionary authority on the plan administrator, the case must be reviewed under the arbitrary and capricious standard of review. The cases Ms. Kenny relies upon for her conclusion that the applicable standard of review is de novo are not binding on this court and are distinguishable on their facts from the case at hand.

2. The medical records and reports, and the surveillance contained in the Administrative Record lead to the conclusion that Ms. Kenny is not totally disabled from *any* occupation and therefore she is not entitled to further disability benefits under the plan. None of the arguments she asserts in support of her motion for summary judgment are sufficient to support a determination that John Hancock was arbitrary or capricious in discontinuing her benefits; and

3. Ms. Kenny's motion for judgment does not include the statement of material facts required by Local Rule 56.1. Also, several of the purported factual statements in her

memorandum do not contain reference to the Administrative Record and some are not part of the Administrative Record at all.  Her failure to comply with Local Rule 56.1 is grounds for denial of her motion.

For all of these reasons, as well as those previously set forth in John Hancock's motion for summary judgment and supporting memorandum, Ms. Kenny's motion for summary judgment should be denied and John Hancock's should be granted.

## I.    ARGUMENT

### A.    John Hancock's Decision To Deny Benefits Is Reviewed Under An Arbitrary And Capricious Standard Of Review.

Contrary to Ms. Kenny's assertion, the benefits plan at issue in this case confers on the plan administrator discretionary authority to determine eligibility for benefits.  (00043).[1,2] Therefore, the First Circuit instructs that the court reviews John Hancock's decision to discontinue benefits to Ms. Kenny under a deferential arbitrary and capricious standard of review.  Recupero v. New England Tel. & Tel. Co., 118 F.3d 820, 827 (1st Cir. 1998)(citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  Furthermore, that standard of review does not change because Ms. Kenny's appeal was "deemed denied."

When Ms. Kenny appealed John Hancock's decision to deny her further benefits, her attorney sent a letter dated 11/24/03, stating that Ms. Kenny would also be submitting her chiropractor, Dr. Medwar's office notes.  (00986).  Following a conversation with Ms. Kenny's attorney in 11/03, the Administrative Record reflects that Ms. Kenny's file was forwarded to the

---

[1]    Numbers in parenthetical correspond to the Administrative Record which was submitted with John Hancock's motion for summary judgment.

[2]    In her memorandum in support of her motion for judgment, Ms. Kenny makes the erroneous assertion that the plan at issue here does not grant John Hancock discretionary authority to decide eligibility for benefits.  (Kenny Memorandum, p. 12).  However, in her opposition to John Hancock's motion for summary judgment, Ms. Kenny appears to recognize that the plan does indeed contain the discretionary language necessary to trigger the application of an arbitrary and capricious standard of review.  (Kenny Memorandum, p. 3).

appeals department but that the "appeal will not be inputted into the system until medical information submitted by atty." (01039). There is no evidence in the Administrative Record of further communication with Ms. Kenny's attorney after 11/03.[3]

Ms. Kenny's attorney's letter dated 12/1/03, is not part of the Administrative Record.[4] John Hancock reviewed the records that Ms. Kenny submitted on appeal and determined that there was not sufficient information submitted to warrant reversal of its decision. (01039-1040). However, John Hancock did not render a final decision on the appeal because it was waiting for Ms. Kenny's attorney to send copies of Dr. Medwar's notes to complete the appeal package as he had requested. John Hancock never received those additional records and Ms. Kenny's appeal was deemed denied pursuant to ERISA because John Hancock did not issue a decision while it was waiting for her to complete her appeal package.

Along with the First Circuit's instruction that in the face of the discretionary language present in this case, the court reviews John Hancock's decision to discontinue benefits to Ms. Kenny under a deferential arbitrary and capricious standard of review, Recupero, 118 F.3d at 827, there is also one case in the First Circuit that addresses the standard of review in a deemed denied case. In Sidou v. UNUMProvident Corp., 245 F.Supp.2d 207 (D. Me. 2003), Dr. Sidou argued "that her claim for benefits should be deemed denied …because of unreasonable and excessive delay on Paul Revere's part … Dr. Sidou also ask[ed] the Court to rule … that Paul Revere's deemed denial is subject to de novo review." Id. at 209. The Court ruled that Dr. Sidou's claim was deemed denied but that the case would be reviewed under the arbitrary and capricious standard of review. Id. As grounds therefore the Court relied upon the Supreme

---

[3]    However, the Administrative Record does contain notes of a conversation with Ms. Kenney on March 9, 2004. The telephone notes reflect that Ms. Kenny "called requesting to know if her appeal had been received. Informed [her] that an appeal acknowledgement letter was sent to her atty in November 2003. [Ms. Kenny] thanked me and said she would call her lawyer for information." (01041).

[4]    This letter is appended to Ms. Kenny's opposition as "Attachment A."

Court's ruling regarding standard of review when the plan gives the administrator discretionary authority to determine eligibility for benefits. Id. at 217 citing Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998) and quoting Firestone, 489 U.S. at 115. The court stated that "[t]he First Circuit instructs that courts in this Circuit must "steadfastly" apply de novo review unless the benefits plan "clearly grant[s] discretionary authority to the administrator." Id. citing Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998). Because the Court found that the plan at issue in Sidou granted discretionary authority to Paul Revere, it determined that the arbitrary and capricious standard of review applied. Sidou, 245 F.Supp.2d at 218.

There is no reason for this Court to look any further to determine the standard of review in this case. Given the plan language, the standard of review must be arbitrary and capricious. Other circuit courts of appeal agree.

For example, the Fifth and Sixth Circuits have ruled that appeals denied by operation of ERISA regulations do not alter the otherwise applicable standard of review. See e.g. Southern Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 101 (5th Cir. 1993)(standard of review is no different whether claim is actually denied or deemed denied."); Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988)(same).

Ms. Kenny's assertion that a deemed denied appeal is not subject to the standard of review is based on case law from the Third, Eight, Ninth and Tenth Circuits that are largely distinguishable on their facts, and that are not binding on this Court. See e.g. Clifford v. M/V Islander, 882 F.2d 12, 14 (1st Cir. 1989)("Notwithstanding the division on the issue throughout the circuits, the district court was bound to follow the prior decisions of this court…").

Ms. Kenny conveniently only identifies decisions from courts that have applied the de novo standard of review. However, those decisions are inapposite. In Gilbertson v. Allied

Signal, Inc., 328 F.3d 625 (10th Cir. 2003), upon which Ms. Kenny seeks to rely, the court determined that the de novo standard of review applied to the deemed denied decision because there were "substantial violations of ERISA." Id. at 631. The court discussed the Eighth Circuit's decision in McGarrah v. Hartford Life, 234 F.3d 1026, (8th Cir. 2001), where the plan administrator's denial of benefits was reviewed for abuse of discretion even though the claimant's appeal had been deemed denied.

In McGarrah, the Eighth Circuit held that "the mere presence of a procedural irregularity [such as not responding to an appeal] is not enough to strip a plan administrator of the deferential standard of review." McGarrah, 234 F.3d at 1031. As the Gilbertson court noted, "[b]ecause the plan administrator's initial decision [in McGarrah] thoroughly explained the basis for the adverse decision and the claimant's submissions on appeal contained 'no new medical evidence' contradicting the initial decision, the court held that the claimant's appeal 'required no response by [the administrator] to permit meaningful judicial review.' [Instead] even 'deemed denied' decisions can be afforded judicial deference if the reviewing court determines that the administrator's initial denial and statement of reasons can effectively be applied to the claimant's appeal.'" Gilbertson, 328 F.3d at 633, citing McGarrah, 234 F.3d at 1031.

The Gilbertson court did not state that the decision in McGarrah was wrong. Rather it distinguished itself on its facts. Gilbertson, 328 F.3d at 633. In Gilbertson, the initial denial decision could not be applied on appeal because following that denial, at the request of the plan administrator Gilbertson submitted a significant amount of new evidence for consideration. The plan administrator sat silent on that evidence and never informed Gilbertson of a reasoned evaluation of it. "Because [the plan administrator] never issued a reasoned evaluation of the new

evidence, it is impossible for a court to discern, much less properly review, the basis for [the] adverse decision. This precludes deferential review…" Id. at 634.

The Gilbertson court reviewed the many cases in which "Courts have …overlook[ed] administrators' failure to meet certain procedural requirements when the administrator has substantially complied with the regulations and the process as a whole fulfills the broader purposes of ERISA and its accompanying regulations." Id. at 634, (citations omitted). The court "agree[d] that a 'substantial compliance' approach is appropriate…" Id. The court stated that "in the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to de novo review." Id. at 635.

Unlike in Gilbertson, here there was a meaningful dialogue between Ms. Kenny and John Hancock, the initial denial decision was well reasoned and communicated to Ms. Kenny, and the materials Ms. Kenny submitted on appeal contained no new information that contradicted John Hancock's initial decision.[5] John Hancock reviewed those materials and concluded that they did not provide sufficient information to reverse its initial decision. (01039). As such, even the Gilbertson court would agree that John Hancock substantially complied with ERISA, that Ms. Kenny's appeal required no response by John Hancock to permit meaningful judicial review, and therefore that the arbitrary and capricious standard of review should be applied.

Ms. Kenny's reliance on Seman v. FMC Corp., 334 F.3d 728 (8th Cir. 2002), is likewise misplaced. Unlike the present case, in Seman the initial application for benefits was submitted with only 3 pages attached to it: the Social Security decision, the Veterans Administration decision, and a page stating Seman's diagnosis. Id. at 733. However, in support of his appeal,

---

[5]     The materials Ms. Kenny submitted on appeal are set forth and discussed in paragraph 43 of John Hancock's Statement of Material Facts which were filed with the court in conjunction with its motion for summary judgment. They can be found in the Administrative Record beginning at page 00986.

Seman submitted a great deal of medical evidence. The court found that "[i]mportantly, the existing record indicates that FMC did not have the medical evidence before it when it denied Seman's initial application for benefits." Id. The Court held that "[w]hen a plan administrator denies a participant's initial application for benefits and the review panel fails to act on the participant's … appeal, the … standard of review will be de novo rather that for abuse of discretion *if* the review panel's inaction raises *serious doubts* about the administrator's decision." Id. (emphasis added). That was the case in Seman because all of the true medical evidence was submitted after the initial decision by FMC. Id. However, that is not the case here where John Hancock had significant information regarding Ms. Kenny, based it's initial denial on that information, and where the materials Ms. Kenny submitted on appeal contained no new information that contradicted John Hancock's initial decision.

There is ample reason in the various circuit court opinions to support the application of an arbitrary and capricious standard of review even in deemed denied cases. Moreover, there is precedent for doing so in the First Circuit. See Sidou v. UNUMProvident Corp., 245 F.Supp.2d 207. Therefore, the Court should apply the arbitrary and capricious standard of review provided for by the plan.

B.    John Hancock's Decision Denying Total Disability Benefits Was Not Arbitrary Or Capricious And Should Be Upheld.

1.    The independent medical examiners' reports from 1995 and 1997 do not form a basis for Ms. Kenny to be found totally disabled from *any* occupation in 2003.

Ms. Kenny's attempted reliance on the opinions of Dr. McGowan, rendered in 1995 (00501-507), and those of Dr. Felsenstein rendered in 1997 (00567-571), are misplaced. First, when those opinions were rendered, John Hancock paid Ms. Kenny benefits. Second, those reports and the findings on which they are based were prepared eight and six years, respectively,

<u>before</u> John Hancock stopped paying Ms. Kenny benefits.  They were based on Ms. Kenny's medical records, the symptoms that Ms. Kenny reported having, and those two physicians' examinations of her *at that time*.

In Dr. McGowan's 1995 report, she notes that Ms. Kenny "currently appears to barely be able to provide for her own personal care.  For example, she appears to take naps and need to rest after showering, combing or washing her hair.  Any minimal exertion or stress appears to exacerbate her chronic immune fatigue dysfunction symptoms …"  (00507).

In Dr. Felsenstein's 1997 report, she notes that "[b]y the patient's history, she continues to have episodes of shakiness with exercise.  …  She takes four to five hours to get ready in the morning.  She continues to have fatigue with exertion.  She has muscle pain in both of her arms and sometimes in her legs."  (00569).

These types of findings were not present on in 2003.  Indeed, over the years, the level and intensity of Ms. Kenny's medical treatment and her condition significantly changed

> 2.    In the years leading up to the denial of benefits in 2003, Ms. Kenny did not seek or obtain medical treatment as frequently as she did in the earlier years of her claim.

Ms. Kenny's condition in the years leading up to and including 2003 was much better than her condition was at the time Drs. McGowan and Felsenstein performed their independent medical examinations of her.  However, Ms. Kenny attempts to establish that in 2003 she was still totally disabled by cherry picking information from multiple medical records that are not reflective of her actual activities.

For example, she states that "Dr. Rothfeld opined that [she] was 100% disabled and 'meets the criteria for diagnosis for fibromyalgia.  She requires frequent medical visits which would interfere with working even part time.'"  (Kenny Memorandum, p. 22).  What Ms. Kenny fails to include in her recitation of Dr. Rothfeld's November 4, 2003, letter is his statement that

she is required "to remain housebound." (00992). As of 2003, Ms. Kenny hardly appears to be housebound or to need to be housebound. For example, during the surveillance conducted on three days in February 2003, Ms. Kenny was seen out of her house for several hours each day engaging in activities which included, but were not limited to, the following: going up and down stairs, walking, and bending over -- all while empty handed and while carrying things including her toddler son (awake and asleep); driving distances at regular and very fast rates of speed (in excess of 92 miles per hour) while alone in her car with her toddler son; eating out in a restaurant alone with her toddler son; visiting with friends alone with her toddler son; and going grocery shopping alone with her toddler son. (00924-937, video).

In addition, the medical records in the years leading up to and including 2003, do not reflect the "frequent medical visits" that Dr. Rothfeld references. (00992). According to the Administrative Record, Ms. Kenny saw a doctor only six times in 1999, once in 2000, seven times in 2001, five times in 2002, and seven times in 2003.[6] This is hardly so many visits that she could not go to work because she was constantly seeing doctors.

In addition, many people work and obtain chiropractic care, for example, on a weekly basis. However, there is a lack of evidence in the Administrative Record to conclude that Ms. Kenny was even doing that. There are huge gaps of time where there is no record Ms. Kenny was receiving chiropractic care. From 8/99 to 5/02 and from 6/02 to 10/03, there is no documentation Ms. Kenny received regular chiropractic care. Indeed, Dr. Medwar's, the chiropractor, letter dated October 8, 2003 states that she is treating Ms. Kenny only on a "symptomatic basis." (00991). Moreover, Ms. Kenny's attorney's letter of November 24, 2003 promised to send Dr. Medwar's office notes. (00986). However, they were never submitted!

---

[6]     1999 visits:  00679, and 680-682; 2000 visit: 01027; 2001 visits: 01027, 1028, 821, and 809-810; 2002 visits: 00821, 822, 1028-1029, 1030 and 1031; and 2003 visits: 01031-1032, 1012, 1011, 988-989, 1013, and 1014.

The conclusion from the lack of evidence is clear. Ms. Kenny rarely saw her chiropractor from 1998 through 2003.

Ms. Kenny needed less care because her CFS improved with time. Notably, in her 1995 IME report, Dr. McGowan stated that "[t]he prognosis of chronic fatigue syndrome is notoriously variable *with cases described as lasting 8-10 years*." (00506, emphasis added). By 2001, it had been 10 years since Ms. Kenny was diagnosed with CFS.

In addition, in her memorandum in support of her motion for judgment, Ms. Kenny quotes a medical dictionary (which is not part of the Administrative Record) which states CFS can spontaneously resolve. As such, even Ms. Kenny acknowledges that people who have CFS get better and it is not necessarily a permanent condition.

      3.      The surveillance of Ms. Kenny in 2001 and 2003 is damning to her claim of total disability.

          a.      The IME physicians who saw Ms. Kenny in 1995 and 1997 would not recognize her in the surveillance in 2001 and 2003.

Neither Dr. McGowan nor Dr. Felsenstein were faced with the surveillance tapes and reports of Ms. Kenny's activities at the time they rendered their opinions. The activities captured on surveillance reflect that in 2001 and 2003, Ms. Kenny was much better than she was in 1995 and 1997. (00722-734, 738-746, 924-937 and video). Specifically, from the surveillance it is evident that:

- Ms. Kenny does not appear to be "barely able to provide for her own personal care" as she was in 1995. (00507). Instead, she cares for herself and her infant and then toddler son.

- Ms. Kenny does not show any effects of "any minimal exertion or stress" that she reported in 1995. (00507). Instead, she is able to walk, carry, drive, shop, and socialize and do so more than one day at a time.

- Ms. Kenny showed no "episodes of shakiness with exercise." (00569). Instead, she is fully capable of carrying her son, going on walks, pushing a stroller, going grocery

shopping, pushing a grocery cart, carrying groceries.

▪    Ms. Kenny does not take four to five hours to get ready in the morning.  (00569).
     Instead, she is out of the house during the morning hours.  In September 2001, Ms.
     Kenny was out of the house with her infant son on four dates between 9:55 and 11:08
     a.m.  (00726, 730, 740, 744, video).  In February 2003, Ms. Kenny was out of the house
     alone with her toddler son on three dates between 9:17 and 10:30 a.m.  (00929, 932, 934).

▪    Ms. Kenny's behavior is not consistent with pain in her arms or legs.  (00569).  Instead,
     she carries her son in his car seat often in 2001, and carries her son, then weighing some
     25 pounds, frequently in 2003.  Indeed, in all the surveillance, we never once see Ms.
     Kenny's toddler son stand or walk.  She is always carrying him, pushing him in a stroller
     or driving him in her car.

In addition, Ms. Kenny claims to have conditions that are difficult to diagnosis with

objective means.  This makes the utility of an IME examination much less.  Indeed, during her

conversation with John Hancock's in-house physician in 1997, the IME physician, Dr. Felenstein

stated that it is "very difficult to determine whether one has [CFS] based on one visit alone."

(00594).

Given the nature of CFS, and the absence of many objective medical findings in support

of this diagnosis, one of the best ways to determine what impact the diagnosis is having on a

person is to watch what they are doing, and how well they are doing it.  That makes surveillance

even more significant.  What better way to determine what Ms. Kenny can and cannot do than to

watch and see?  And that is exactly what John Hancock did in February 2003.  Interestingly, as

discussed in John Hancock's Memorandum in Support of its Motion for Summary Judgment, the

surveillance of Ms. Kenny in February 2003 was even more damning than the surveillance of her

in September 2001.  (00924-937, video).

              b.    The cases Ms. Kenny seeks to rely upon to discount the
                    significance of the surveillance in this case are inapposite.

Ms. Kenny's attempt to rely on a series of cases to support her claim that the surveillance

of her cannot be used as a reason to terminate benefits is misplaced.  None of the cases she cites

have as much surveillance as there is in this case, nor does the surveillance obtained in those

cases come close to showing the activity level reflected in the surveillance of Ms. Kenny.

Specifically, in each of the following cases cited by Ms. Kenny the courts found that the

surveillance did not support a decision that the claimant was not totally disabled:

▪ In <u>Milgliaro v. IBM Long-Term Disability Plan</u>, 231 F.Supp. 2d 1167 (M.D. Fla. 2002),
there were only two days of surveillance and there was video for only one of the days.
<u>Id.</u> at 1178. That video simply shows Milgliaro leaving her house two times, walking
short distances with and without a cane, and sitting in a chair. <u>Id.</u> The court found that
"there is nothing contradictory about the movements made by Plaintiff on the tape and
the medical information before MetLife." <u>Id.</u> The court also found that the statements in
the surveillance report, which indicate that Milgliaro was more active, "fail to overcome
the stark reality shown by the videotape." <u>Id.</u>

▪ In <u>Cunningham v. Paul Revere Life Ins. Co.</u>, 235 F.Supp. 2d 746 (W.D. Mich. 2002), the
expert on whom Paul Revere relied referred to a surveillance tape as justification for his
opinion that Cunningham was not disabled by his cardiac condition. <u>Id.</u> at 756.
However, the expert did "not attempt to explain what information on the surveillance
tapes is sufficient to overcome the effects of Plaintiff's low ejection fraction [16-17%].:"
The investigative report indicated that during five days of surveillance *most of the time*
Cunningham was in the house where his activities could not be determined. The court
held that "[t]his scant evidence provides no reasonable basis for ignoring the *objective
indicators* showing the continual deterioration of the strength of Plaintiff's severely
compromised heart function." <u>Id.</u> (emphasis added).

▪ In <u>Osbun v. Auburn Foundry, Inc.</u>, 293 F.Supp. 2d 863 (N.D. Ill. 2003), "Auburn reached
the conclusion that a mentally retarded, illiterate, partially blind, partially deaf, arthritic
man with arteriosclerotic heart disease, thyroid insufficiency, and high blood pressure is
capable of gainful employment *simply because he performed 1.5 hours of light physical
tasks over the course of two days,* and in spite of three medical reports finding total
disability." <u>Id.</u> at 871, (emphasis added).

▪ In <u>Trolson v. Aetna Life Ins. Co.</u>, 2002 U.S. Dist. LEXIS 24825 (N.D. Calif. 2002), two
days of surveillance resulted in a *four minute video* of Ms. Trolson leaving a doctor's
office, driving and eating. <u>Id.</u> at *7. The court found that the opinions of the treating
physicians and independent physicians who examined Ms. Trolson were consistent, and
that the four minutes of video did not contradict the medical findings. <u>Id.</u> at *14.

▪ In <u>Clausen v. Standard Ins. Co.</u>, 961 F.Supp. 1446 (D. Colo. 1997), the "surveillance
video documents [portions of] one eight-hour period in Clausen's life. … There is
nothing in the record suggesting Clausen was capable of such activity on a sustained
basis or that the video documented anything other than a good day …" <u>Id.</u> at 1457.

- Ms. Kenny's reliance on <u>Rigby v. Bayer Corp.</u>, 933 F. Supp. 628 (E.D. Tex. 1996) is also misplaced. The quotation she ascribes to the case is nowhere to be found in it. Moreover, in <u>Rigby</u>, the *only* evidence the administrator used to support its decision to discontinue benefits was the videotapes of surveillance. <u>Id.</u> at 634.

In contrast, the surveillance of Ms. Kenny spans eight days, some of which were consecutive, and all of which show Ms. Kenny in very good health. This surveillance, in conjunction with the other evidence in the Administrative Record appropriately forms the basis for John Hancock's reasoned decision to discontinue disability benefits to Ms. Kenny.

> c.    Contrary to Ms. Kenny's assertion, the surveillance does not detail just a "small period" of time in her life.

The video surveillance of Ms. Kenny is not just a snippet of her life. It is surveillance of her activities on multiple days in September 2001 and February 2003. Notably, in February 2003, it was cold and there was snow and ice on the ground. Nevertheless, on multiple occasions the surveillance showed Ms. Kenny being quite active.

Ms. Kenny's activities are not all captured on the surveillance videotape. Though the tape shows much activity, there is also activity documented in the surveillance reports that is not captured on videotape. For example, Ms. Kenny's wild car ride at speeds in excess of 90 miles per hour, are documented in the report but not on videotape. (00932-933).

Ms. Kenny wants this Court to believe that the video has just caught her on good days. However, it is hard to conceive how this could be true. Could it be that every time surveillance was conducted, it was a good day for Ms. Kenny?! There is not one day of surveillance that supports the proposition Ms. Kenny was physically compromised. It is hard to conceive how in the face of the surveillance videotape and reports Ms. Kenny can possibly claim to be totally disabled. The surveillance itself is objective evidence of Ms. Kenny being active.

4.    Ms. Kenny's challenges of Dr. Yarosh have no basis in the
Administrative Record and contrary to her assertions, John
Hancock's reliance on Dr. Yarosh was reasonable and
appropriate.

Dr. Yarosh is a Diplomate of the American Board of Psychiatry and Neurology.  Dr.

Yarosh is also a Diplomate of the American Board of Internal Medicine.  (00900).  There is no

information in the Administrative Record that Dr. Yarosh is only a psychiatrist, rather he is

board certified in psychiatry and neurology (that is the name of the board that certifies physicians

practicing psychiatry and neurology).  Ms. Kenny's repeated characterizations of Dr. Yarosh

only as a psychiatrist are simply wrong.

Likewise, there is no evidence in the Administrative record about who owns Behavioral

Management, Inc. ("BMI"), or what BMI is, beyond what is indicated on Dr. Yarosh's

letterhead.  (00891).  Ms. Kenny's repeated pot shots at Dr. Yarosh in her memorandum are not

substantiated by the Administrative Record and are not warranted.

As she is prone to doing, Ms. Kenny cherry picks from Dr. Yarosh's report to attempt to

paint the picture that she wants to be seen.  (Kenny Memorandum, p. 8).  She tries to make it

appear that Dr. Yarosh is the only physician who ever considered that Ms. Kenny's underlying

condition may be largely psychiatric.  (00899).  However, the Administrative Record and Dr.

Yarosh's letter summarizing his detailed review of that record reflect that this is simply not true.

For example, just a few lines above those that Ms. Kenny included in her memorandum,

Dr. Yarosh writes his "Conclusions/Summary."  (00899).  There he states:

Several physicians have advocated that she is totally impaired *and many of these are
homeopathic or holistic physicians*. …  A thorough review of her workup indicates that
Ms. Kenny has had a series of medical complaints, some of which have been
substantiated by objective data.  …  However, the majority of documentation in this
workup fails to reveal an ongoing active rheumatologic problem and also fails to reveal
an ongoing infectious problem.  …  Although *there have been comments in the chart
alluding to the need for psychotherapy, most notably Dr. Hoffman,* there is no
documentation in the medical record suggesting that Ms. Kenny has undergone a

thorough psychological assessment or treatment *physicians have suggested that there may be a significant psychological component to her presentation.*  (00899, emphasis added).

As is evidenced by this portion of his report alone, Dr. Yarosh, the double board certified physician, is not making things up out of thin air.  He is basing his opinions on information contained in the Administrative Record.

In addition, Ms. Kenny conveniently puts ellipses in the part of Dr. Yarosh's opinion that she does not want to bring to the Court's attention.  (Kenny Memorandum p. 7).  Among that missing from Ms. Kenny's recitation of Dr. Yarosh's opinions is the following:

> *The medical record indicates that Ms. Kenny is not motivated to return to work.*  There is no documentation that she has expressed any remorse or frustration at not being able to return to work.  *The surveillance video clearly shows her engaging in activities which she has stated are very difficult for her to complete.*  (00899-900, emphasis added).

Finally, Ms. Kenny misquotes Dr. Yarosh's report at page 8 of her memorandum.  Specifically, she omits without ellipses the following:

> Her impairment has been based primarily on, and, in fact, *almost entirely on the subjective findings.  Many of the physicians have taken her subjective* findings at face value as opposed to more critically examining personality factors or psychological processes, which may accompany the presentation of somatic symptoms.  (00900, emphasis indicates text that was missing from Ms. Kenny's recitation of Dr. Yarosh's opinions).

Ms. Kenny also makes no mention of the fact it is she who prevented Dr. Yarosh from being able to speak with her treating physicians to better understand her medical condition.  Instead, Dr. Yarosh was forced to pose written questions to Dr. Shah and received written responses.  This limited exchange did not produce any new or meaningful information and did not permit for a more comprehensive review and analysis of whatever Dr. Shah may have been thinking.

In Dr. Shah's written responses to Dr. Yarosh's questions, the limitations he states are inconsistent with the activities Ms. Kenny is observed engaging in on multiple occasions.  With

regard to the "attached symptom checklist" and "positive fibromyalgia trigger points" which Dr. Shah references (00956), both are self-reported by Ms. Kenny.

Ms. Kenny is in a CFS support group. She reads about medical matters and often brings concerns about what she has read to the attention of her physicians, thinking that she has the latest condition about which she has read. (See e.g., 01031-1032). She's a CFS expert. She knows the condition and, most importantly, she has a motive – to continue collecting disability benefits. She knows just what to say to her physicians.

It is clear from the Administrative Record that Ms. Kenny's life in the few years leading up to the denial of her benefits in 2003, was going well. She was newly married, had moved to a home in the suburbs, no longer lived with her parents in the same building, and she had a beautiful new baby whom she breast fed and carried everywhere.

Indeed, Ms. Kenny seemed very satisfied with her life, taking walks with her husband and son in the daytime, going out to the store and to visit with friends with her son, walking in the neighborhood, chatting with and smiling at most everyone wherever she went. This is not the picture of a woman in pain. Nor is it the picture of a woman who wants to change her life at all. However, it is the picture of a woman who no longer meets the definition of total disability set forth in the Plan. John Hancock's decision to discontinue paying Ms. Kenny disability benefits was not arbitrary and capricious.

     5.     It was appropriate for John Hancock to look for objective evidence that Ms. Kenny's CFS condition was impairing her functionally.

Ms. Kenny misapprehends John Hancock's interest in objective evidence in this case. John Hancock was not looking for objective evidence of CFS. Rather it was looking for objective evidence that Ms. Kenny's CFS was causing her functional impairment sufficient to render her totally disabled.

The cases that Ms. Kenny relies upon at pages 16-17 of her memorandum are inapposite. Furthermore, Ms. Kenny's assertion that the First Circuit has "expressed a preference for the opinions of treating physicians [of patients with CFS] due to the nature of the impairment" is not true. For this proposition, Ms. Kenny cites to the <u>Cook v. Liberty Life</u>, case (Kenny Memorandum, p. 16). However, nowhere in <u>Cook</u> is this "preference" stated. Indeed in <u>Cook</u> the *only* medical records in the file were those of Ms. Cook's treating physician, and Liberty had not developed *any* contradictory medical evidence in the record to support its decision to reject Cook's evidence. <u>Cook v. Liberty Life Assurance Co.</u>, 320 F. 3d 11, 23 (1st Cir. 2003). As such, the only medical evidence that could possibly be relied upon was that of Ms. Cook's treating physician. That is simply not the case here.

Furthermore, in <u>Cook</u>, the court found that benefits were arbitrarily and capriciously discontinued when there was no difference in the medical opinions that Ms. Cook had been submitting for years, and pursuant to which she received benefits. <u>Id.</u> Again, that is not the case here. Here, there is a significant difference in the medical records and condition of Ms. Kenny that formed the basis for her to receive disability benefits for years, and that from 2000 to 2003, culminated in the discontinuation of her benefits. As John Hancock informed Ms. Kenny in its denial letter to her, (00967-970), there was a significant change in the frequency of her treatment, the analysis of her medical records, and the surveillance evidence of her actual activities on many days.

> 6.  John Hancock did not have a duty to obtain another IME before deciding to discontinue Ms. Kenny's disability benefits in 2003.

Ms. Kenny's suggestion that John Hancock's decision was arbitrary and capricious because it did not arrange for another independent medical examination of her is incorrect. John Hancock's duty is to reasonably assess the information presented to it. Ms. Kenny had an

affirmative duty to present to John Hancock any evidence she wanted it to consider.  See

Brigham v. Sun Life of Canada, 317 F.3d 72, 84-85 (1st Cir. 2003); Sandoval v. Aetna Life &

Cas. Ins. Co., 967 F. 2d 377, 379-381 (10th Cir. 1992); Jorstad v. Conn. Gen. Life Ins. Co., 844

F. Supp. 46, 58 (D. Mass. 1994).

John Hancock did not have a duty to obtain another independent medical examination to

establish a reasonable basis for its denial.  See Cook, 320 F.3d. at 23 ("To be sure, we are not

suggesting that [obtaining an IME is] necessary in every termination of disability benefits to

establish a reasonable basis for the termination."); see also Tinkham v. Conn. Gen. Life Ins. Co.,

2000 U.S. Dist. LEXIS 9944, *27 (D. Me.)(in finding that not arranging for an IME and not

arranging for claim file to be reviewed by medical consultant was not arbitrary and capricious,

court noted it was unable to find a reported case indicating such a requirement).

Ms. Kenny never asked for an IME.  She had the same attorney in 2003 when her

benefits were discontinued as she does now, yet it is only now that she claims that another IME

was warranted.  Following receipt of Dr. Yarosh's report, it was not incumbent on John Hancock

to obtain an independent medical examination.  Just because John Hancock had obtained IMEs

before, does not mean that it was obligated to do so again.[7]

The question here is simply whether John Hancock's decision to discontinue Ms.

Kenny's benefits in 2003 was reasonable based upon the information available to John Hancock.

An examination of the entire Administrative Record reveals that it was.  The steps John Hancock

took with regard to written communications between Dr. Yarosh and Dr. Shah following Dr.

---

[7]    Ms. Kenny attempts to make much out of Dr. Yarosh's sentence in his report that "It is impossible to ascertain
*for sure* whether she is able to return to work without benefit of a direct examination."  (00900, emphasis
added).  However, looking at Dr. Yarosh's eight page single spaced letter in its totality, he clearly renders
numerous opinions based upon the Administrative Record about Ms. Kenny's medical condition and her ability
to work.  That review and the other evidence in the Administrative Record supported John Hancock's decision
to discontinue Ms. Kenny's benefits' in June 2003.

Yarosh's record review and report, and the added surveillance that John Hancock ordered were reasonable steps for John Hancock to take in further evaluating Ms. Kenny's disability status at that time.

      C.     **Ms. Kenny's Failure To Comply With Local Rule 56.1 Is Fatal To Her Motion And It Should Be Dismissed Or Denied.**

Local Rule 56.1 provides in relevant part that:

…[m]otions for summary judgment **shall include** a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, **with** page references to affidavits, depositions and other documents. **Failure to include such a statement constitutes grounds for denial of the motion**. (Emphasis added).

"This Local Rule has teeth, and can be dispositive; parties ignore such rules at their own peril." <u>Barry v. Wing Memorial Hosp.</u>, 142 F.Supp.2d 161, 163 n. 1 (D. Mass. 2001)(internal punctuation omitted). "Counsel should … note the importance of scrupulous compliance with D. Mass. R. 56.1." <u>Id.</u> Failure to "scrupulous[ly] compl[y]" with the Rule's terms can result in dismissal of the moving party's summary judgment motion. <u>Id.</u>; <u>see</u> <u>Shabazz v. Cole</u>, 69 F.Supp.2d 177, 185-186 (D. Mass. 1999); <u>Rand v. M/A-Com, Inc.</u>, 824 F.Supp. 242, 266 (D.Mass. 1992).

Here, Ms. Kenny's motion does not contain the required concise statement of material facts as required by L.R. 56.1.[8] As such, her motion should be denied. <u>See</u> <u>Barry v. Wing Memorial Hosp.</u>, 142 F.Supp.2d at 163 n. 1; <u>Shabazz v. Cole</u>, 69 F.Supp.2d at 185-186; <u>Rand v. M/A-Com, Inc.</u>, 824 F.Supp. at 266.

In addition, the First Circuit, has reaffirmed "that statements contained in a memorandum or lawyer's brief are insufficient, for summary judgment purposes, to establish material facts." <u>Betances v. Sea-Land Service</u>, 248 F. 3d 40, 43 (1st Cir. 2001). Where, as here, Ms. Kenny's

---

[8]    While Ms. Kenny's motion omits the word "summary", it is clear the motion is based on Rule 56.

counsel makes statements in the memorandum in support of her motion that are factual in nature

(though many of them lack reference to the Administrative Record to confirm their veracity, and

others are plainly not part of the Administrative Record), these statements are insufficient for

summary judgment purposes to establish material facts.  Betances v. Sea-Land Service, 248 F. 3d

at 43.  (See e.g. pages 2-5, and 7 of Ms. Kenny's memorandum in support of her motion for

judgment).

     In light of this and her failure to comply with L.R. 56.1, Ms. Kenny has not presented this

Court with any material facts to consider.

## II.     CONCLUSION AND RELIEF REQUESTED

     For the reasons stated above and in John Hancock's motion for summary judgment and

memorandum in support thereof, the Court should deny Ms. Kenny's motion for judgment, grant

John Hancock's motion for summary judgment, and enter final judgment in John Hancock's

favor.

JOHN HANCOCK LIFE INSURANCE
COMPANY

By its attorneys,


     /s/  Elizabeth L. B. Greene
Joseph M. Hamilton, BBO #546394
Elizabeth L. B. Greene, BBO #561456
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone  (508) 791-8500
Fax:    (508) 791-8502


Dated: March 22, 2005

<u>CERTIFICATE OF SERVICE</u>

I, Elizabeth L. B. Greene, hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Michael J. Kelley, Esq., 167 Milk Street, Suite 428, Boston, MA 02109.

/s/  Elizabeth L. B. Greene
Elizabeth L. B. Greene

Dated: March 22, 2005